John C. Rake, OSB #105808
jrake@lvklaw.com
Larkins Vacura Kayser LLP
121 SW Morrison Street, Suite 700
Portland, Oregon  97204
Telephone: 503-222-4424

Attorney for Plaintiffs Kathryn Gavula and Barbara Wicker

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| KATHRYN GAVULA and BARBARA WICKER, individuals and on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs;<br><br>    v.<br><br>CAMPBELL SOUP COMPANY; BEECH-NUT NUTRITION COMPANY; NURTURE, INC., D/B/A HAPPY FAMILY ORGANICS; GERBER PRODUCTS COMPANY; and THE HAIN CELESTIAL GROUP,<br><br>                 Defendants. | Case No. _____<br><br>CLASS ACTION COMPLAINT<br><br>Civil RICO (18 U.S.C. § 1962)<br><br>DEMAND FOR JURY TRIAL |

I.    Parties .................................................................................................................... 9

   A.    Plaintiffs ............................................................................................................ 9

   B.    Defendants ....................................................................................................... 13

II.    Jurisdiction ......................................................................................................... 17

III.    Factual Background ........................................................................................... 17

   A.    The baby food industry is a large, lucrative market driven by consumer demand for convenience and reassurances of safety .................................................................... 17

   B.    Arsenic, lead, cadmium, and mercury are toxic, hazardous substances. ..................... 20

      1.    Arsenic ......................................................................................................... 22

      2.    Lead ............................................................................................................. 24

      3.    Cadmium ...................................................................................................... 27

      4.    Mercury ........................................................................................................ 27

   C.    Defendants have known for years that their baby food products contained or could contain unsafe levels of heavy metals ........................................................................ 28

   D.    Despite Defendants' knowledge of heavy metal contamination, they concealed the truth and also misled consumers about the safety of their products and the veracity of watchdog reports through press releases, the creation of industry groups, and advertising. ................... 34

      1.    After consumer watchdog reports broke, Defendants released intentionally misleading statements to lull consumers and regulators into inaction. .................................... 34

      2.    Using Big Tobacco's playbook, Defendants rush to create the Baby Food Council and each uses it as a vessel for fraud. ......................................................................... 37

      3.    Throughout this time, Defendants continue to falsely reassure consumers that their products are healthy, safe, pure, and natural. ............................................................. 48

   E.    Despite Defendants' knowledge of risks and representations to consumers, the recent Congressional Report demonstrates through internal documentation that nothing has changed, and Defendants continue to put children at risk and engage in food fraud. ........................ 74

      1.    Arsenic findings ........................................................................................... 76

      2.    Lead findings ................................................................................................ 78

      3.    Cadmium findings......................................................................................... 79

      4.    Mercury findings........................................................................................... 80

      5.    Uncooperative Defendant hides its contamination. ..................................... 81

6.    Beyond specific testing results, the Subcommittee noted serious shortcomings in Defendants' overall manufacturing, testing, and sale of the products. ............................... 82

F.    After the Congressional Report, Defendants again presented the public with misleading half-truths to avoid having to eliminate harmful contamination and avoid further regulation. 85

G.    Equitable Tolling, Discovery Rule, and Fraudulent Concealment ............................. 90

IV.    Class Action Allegations.................................................................................................. 92

V.    Claim ................................................................................................................................ 95

A.    The Baby Food Council Is Infiltrated by Each Defendant and Used as An Enterprise for Fraud  97

B.    The Enterprise ........................................................................................................ 101

C.    The Pattern of Racketeering: Mail Fraud and Wire Fraud and Corruption of an Official Proceeding ...................................................................................................................... 103

D.    Causation and Damages .......................................................................................... 119

## INTRODUCTION

1.      Food fraud is a crime that siphons millions of dollars every year from unsuspecting American consumers. Food fraud not only results in injury and sometimes death to the person who consumes the altered food, but it also deprives the purchaser of the value of their purchase—*i.e.*, overpayment of the product, sometimes the full amount of the purchase price.[1]

2.      "Food fraud" occurs when bad actors cut corners "to profit financially. It is that intent to profit that separates food fraud from failures in food safety and food quality."[2] Or, as PwC has explained, "[f]ood fraud is simply defined as intentional deception using food for economic gain."[3]

3.      Food fraud's economic toll is growing rapidly both in America and globally: "today's estimates of the global financial cost of food fraud range from $6.2 billion to a massive $40 billion per year."[4]

4.      The roots of food fraud run deep in the American economy. In 1906, Upton Sinclair published a novel, *The Jungle*, to expose the horrors that were occurring in the American meat-packing industry, including the sickness and death of children caused by contamination during

---

[1] Arun Chauhan, *Food fraud – an evolving crime with profit at its heart*, NEW FOOD (Apr. 23, 2020) ("Loss can also be paying a premium for goods that are presented as being of superior quality, when in reality they have been made cheaply with contaminated or substitute ingredients. This is loss through overpayment and loss caused by the use of a sub-standard or altered product.").

[2] Luke Cridland, *Food Fraud | When Does Food Become Criminal*, FOOD UNFOLDED (Dec. 17, 2020).

[3] Julia Leong & Tan Hwee Ching, *Tackling food fraud*, PWC.com, https://www.pwc.com/sg/en/services/food-supply-integrity/tackling-food-fraud.html (last visited Mar. 11, 2021).

[4] Luke Cridland, *Food Fraud | When Does Food Become Criminal*, FOOD UNFOLDED (Dec. 17, 2020).

manufacturing and processing. The food manufacturers and suppliers cut corners to increase their profits, putting profits and greed ahead of safety and honesty.

5.      Unfortunately, more than a century later, profiteering among food companies remains a major problem in America. In particular, widespread contamination of baby food with toxic heavy metals is concealed from and misrepresented to the purchasers of baby food products by many of the largest baby food manufacturers.

6.      The greed of executives at baby food companies has caused them to orchestrate long-running, ongoing schemes to defraud involving premium baby food. Several companies have promised and reassured parents that their baby food products are pure, natural, safe, and healthy; in reality, these products contain heavy metals that are impure, unnatural, unsafe, and pose a major risk to babies and infants.

7.      Had parents (or guardians)[5] been fully informed about the contents of the baby food they purchased, they would not have bought the premium baby food—or would have paid far less for less-than-premium products. And no reasonable consumer would have purchased baby food contaminated with heavy metals had that contamination been fully disclosed and made transparent.

8.      The baby food fraud alleged in this case occurred in multiple stages. Executives at each company devised a scheme to defraud in which baby food would be represented as something different than what it was, which made the food not safe for consumption. Then, once their food fraud was exposed to the public, Defendants also engaged in additional fraudulent acts to cover up, conceal, and continue their ongoing schemes to defraud.

---

[5] This Complaint uses the term "parents" at times instead of "guardians"; any purchaser of baby food within the scope of the class definition is a class member.

9.      The mail and wire fraud statutes have a long-established meaning: each mailing and each use of the wires *in furtherance of* a scheme to defraud is a separate criminal act. In turn, given the scope of the advertising and marketing and constant use of the Internet, telephone, and email by Defendants, each Defendant has engaged in a pattern of wire and mail fraud since at least January 2019, when Defendants formed and began using the Baby Food Council as a vessel for fraud.

10.      This ongoing fraud was only recently revealed. On February 4, 2021, the U.S. House of Representatives Committee on Oversight and Reform released the explosive report, "*Baby Foods Are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury*." (hereinafter "the House Staff Report" or "Congressional Report"). The House Staff Report exposed rampant fraud, misrepresentations, fraudulent omissions, half-truths, and fraudulent concealment committed by the nation's seven leading baby food manufacturers in selling food to the most vulnerable in our population: infants and toddlers.[6]

11.      The House Staff Report highlighted the high levels of toxic heavy metals present in numerous baby foods produced by Defendants, namely the four Defendants (Beech-Nut, Gerber, Hain, and Nurture) who cooperated with Congress's investigation.

12.      Campbell refused to cooperate fully,[7] which suggested their misconduct was even more nefarious (particularly because it is unusual for corporations not to cooperate with federal regulators).

---

[6] Staff Report, Subcommittee on Economic and Consumer Policy of the Committee on Oversight and Reform, U.S. House of Representatives, *Baby Foods Are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury* (Feb. 4, 2021) https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2021-02-04%20ECP%20Baby%20Food%20Staff%20Report.pdf (hereinafter "House Staff Report") (attached as Ex. A).

[7] *Id.* at 2.

13.    Although there has been no conclusion about a safe level of these hazardous heavy metals in baby foods, the FDA sets the maximum allowable levels of these toxic heavy metals in water bottles safe for consumption at 10 parts per billion (ppb) inorganic arsenic, 5 ppb lead, and 5 ppb cadmium.[8] Similarly, the EPA only allows up to 10 ppb of arsenic, 10 ppb of lead, 5 ppb of cadmium, and 2 ppb of mercury in public drinking water.

14.    The levels of these toxic heavy metals that would pose health risks to infants and children are likely far less than those set for a bottle of water because the bottled water limits are set assuming adult consumption—not that of an infant or toddler.

15.    The baby food at issue, examined in the House Staff Report, showed levels as high as **91 times** as much arsenic, **177 times** as much lead, **69 times** as much cadmium, and **5 times** as much mercury than levels allowed in bottled water.[9]



16.    All of these toxins are harmful to the babies and children who ingested them. Exposure to these heavy metals can result in:

---

[8] *Id.* at 4.

[9] *Id.*

a.   Permanent decreases in IQ;

b.   Diminished future economic productivity;

c.   Increased risk of future criminal and antisocial behavior in children;

d.   Affected neurological development and brain function in infants;[10]

e.   Other unknown and harmful effects to children.

17.    But baby food is big business and these companies feared that billions of dollars of revenue might slip away if they took the precaution, time, and necessary steps to produce healthy and safe-for-consumption baby food. So Defendants cut corners, covered up their schemes, and have failed to recall their products or stop their campaign of lies and misrepresentations.

18.    This criminal behavior among several of America's top baby food manufacturers remains ongoing and must be stopped. Fortunately, Congress passed the Racketeer Influenced and Corrupt Organizations Act ("RICO") in 1970 to address situations precisely like this: situations of interstate, nationwide fraud that no state can tackle on its own and situations where federal prosecutors and agencies either lack the resources or priorities to immediately stop the fraud (that is not to say indictments will not follow, but indictments typically come many years later—not immediately).

19.    The contamination of baby food is a national problem affecting purchasers (and children) in all 50 states. In turn, it requires a national, 50-state solution. Defendants' divide-and-conquer approach to state laws means they will never be held accountable to consumers in all 50 states (even in the existing lawsuits that have been filed in other federal courts) unless RICO is utilized to stamp out their nationwide fraud scheme.

_____

[10] *Id.* at 2.

20.     This case seeks to hold these baby food producers and manufacturers accountable where government enforcement has not (at least not yet). Defendants should be required to repay the consumers they lied to and stole from—and be subject to whatever regulatory action and criminal indictments that follow in the wake of this case.

## I.    PARTIES

### A. Plaintiffs

21.     Plaintiff Kathryn Gavula is a resident of the state of Oregon and purchased baby foods for her children produced by Defendants. Plaintiff Gavula considers how healthy baby food products are as well as the quality control, pure ingredients, and nutritional value of those products in making her purchasing decisions. She paid more for brands she believed were healthier and/or safer for her children.

> a.    Plaintiff Gavula purchased products from Defendant Beech-Nut, namely purees, oatmeal, and rice products, approximately forty times between February 2016 and May 2021 in the state of Oregon. Plaintiff Gavula read the labels of the Beech-Nut products. Plaintiff Gavula purchased Beech-Nut because she believed Beech-Nut's representations that their products contained the few ingredients listed on the label and the labeling suggested this was a simple, healthy option to supplement her children's diets.

> b.    Plaintiff Gavula purchased products from Defendant Campbell, namely Plum Organics pouches, approximately fifteen times between July 2014 and May 2021 in the state of Oregon. Plaintiff Gavula read the labels of the Plum Organics products.  Plaintiff Gavula purchased Plum Organics because she believed Plum Organics' representations on its label and relied on them that Plum's foods were

"organic," had a simple ingredient list, and provided a product her children would like.

c. Plaintiff Gavula purchased products from Defendant Gerber, namely pouches, puffs, and teether crackers, approximately five times between August 2020 and May 2021 in the state of Oregon. Plaintiff Gavula read the labels of the Gerber products. Plaintiff Gavula purchased Gerber products because the label suggested a low number of simple ingredients and her child was a picky eater and liked the Gerber products.

d. Plaintiff Gavula purchased products from Defendant Nurture, namely Happy Baby puffs and teether crackers, approximately forty times between June 2013 and May 2021 in the state of Oregon. Plaintiff Gavula read the labels of the Happy Baby products. Plaintiff Gavula purchased Happy Baby because she believed Happy Baby to live up to the representations regarding ingredients used in their products.

22.    Prior to purchasing these baby foods, Plaintiff Gavula saw Defendants' claims on the packaging alleging the food was nutritious, healthy, and safe, and she relied on these repetitions in purchasing food for her children. During that time, based on Defendants' omissions and the false and misleading claims, warranties, representations, advertisements, and other marketing, Plaintiff was unaware that these products contained any level of heavy metals, chemicals, or toxins, and would not have purchased the food if that information was fully disclosed. Plaintiff was injured by paying a premium for the baby foods that have no or very little value—or whose value was at least less than what she paid—based on the presence of the alleged heavy metals, chemicals, and toxins. After Plaintiff Gavula fed these products to her children, their infant lab work came back

showing elevated lead levels. Plaintiff Gavula has suffered anguish and concern for her children since it has been revealed that these products contain high levels of heavy metals.

23.    Plaintiff Barbara Wicker is a resident of the state of Oregon and purchased baby foods for her child produced by Defendants. Plaintiff Wicker does internet research and reads books before she buys food products for her children. Plaintiff Wicker considers how healthy baby food products are as well as the quality control, pure ingredients, and nutritional value of those products in making her purchasing decisions. She paid more for brands she believed were healthier and/or safer for her children.

      a.    Plaintiff Wicker purchased products from Defendant Beech-Nut, namely pouches, purees, puffs, teether crackers, and snacks over twenty-five times between 2017 and 2019 in Oregon. Plaintiff Wicker may recall seeing advertisements for Beech-Nut between 2017 and 2019 and she read the label on, the Beech-Nut products claiming their baby food was natural and organic. She relied on the label and these advertisements before purchasing food for her daughter. She purchased Beech-Nut because she believed Beech-Nut's representations that their products were healthy for her daughter.

      b.    Plaintiff Wicker purchased products from Defendant Nurture, namely Happy Baby pouches, purees, puffs, rice products, teether crackers, and snacks. Plaintiff Wicker purchased Happy Baby over fifty times between 2017 and 2021 in Oregon. Plaintiff Wicker visited the Happy Baby website, read the Happy Baby labels, and may have seen Happy Baby advertisements. Plaintiff Wicker also read The Happy Family Organic Superfoods Cookbook for Baby and Toddler by Shazi Visram, Happy Baby's Founder and former CEO. Plaintiff Wicker purchased Happy Baby because

she believed Happy Baby representations and advertisements about their nutrition and that they were organic and healthy. Plaintiff Wicker purchased Happy Baby products because she believed they were healthy for her daughter.

c.    Plaintiff Wicker purchased products from Defendant Campbell, namely Plum Organics pouches, purees, puffs, teether crackers, snacks, snack bars, and teensy fruits, over fifty times between 2017 and 2021 in Oregon.  Plaintiff Wicker read the Plum labels and visited the Plum Organics website. She believed the labels claiming their baby food was healthy and organic. She relied on the label before purchasing food for her daughter. She purchased Plum Organics because she believed Campbell's representations that their products were healthy for her daughter.

d.    Plaintiff Wicker purchased products from Defendant Hain, namely Earth's Best Organics pouches, purees, and snacks, over twenty-five times between 2017 and 2020 in Oregon. Plaintiff Wicker may recall seeing advertisements for Earth's Organics and she read the label on the Earth's Best Organics products claiming their baby food was real and organic. She relied on the label and these advertisements before purchasing food for her daughter.   Plaintiff Wicker purchased Earth's Best Organics because she believed Earth's Best Organics' representations and advertisements that their products were healthy for her daughter.

24.    Prior to purchasing these baby foods for her daughter, Plaintiff Wicker saw Defendants' advertisements and claims on the packaging alleging the food was nutritious, healthy, and safe, and she relied on these repetitions in purchasing food for her daughter. During that time, based on Defendants' omissions and the false and misleading claims, warranties, representations,

advertisements, and other marketing, Plaintiff was unaware that these products contained any level of heavy metals, chemicals, or toxins, and would not have purchased the food or paid as much for the baby foods if that information was fully disclosed. Plaintiff was injured by paying a premium for the baby foods that have no or very little value—or whose value was at least less than what she paid—based on the presence of the alleged heavy metals, chemicals, and toxins. Plaintiff Wicker has suffered anguish and concern for her daughter since it has been revealed that these products contain high levels of heavy metals.

25.     Plaintiffs bring this action individually and on behalf of all consumers who purchased baby foods manufactured by Defendants to cause the disclosure of the presence and/or risk of the presence of heavy metals and/or other toxins that do not conform to the labels, packaging, advertising, and statements in the baby food products; to correct the false and misleading perception that Defendants created in the minds of consumers that their products are high quality, healthy, and safe for infant consumption; and to obtain redress for those who have purchased the baby food.

### B. Defendants

26.     Defendant Beech-Nut Nutrition Company ("Beech-Nut") is incorporated in New York. Its headquarters and principal place of business is located at One Nutritious Place, Amsterdam, New York 12010.

27.     Defendant formulated, developed, manufactured, labeled, distributed, markets, advertised, and sold under the baby food brand name Beech-Nut throughout the United States, including in this District, during the Class Period (defined below). The advertising, labeling, and packaging for these products, relied upon by Plaintiffs, was prepared, reviewed, and/or approved by Defendant and its agents and was disseminated by Defendant and its agents through marketing, advertising, packaging, and labeling that contained the misrepresentations alleged herein. The

marketing, advertising, packaging, and labeling for these baby foods was designed to encourage consumers to purchase them and reasonably misled the reasonable consumer, i.e., Plaintiffs and the Class, into purchasing them. Defendant owns, manufactures, and distributes the baby foods and created, allowed, negligently oversaw, and/or authorized the unlawful, fraudulent, unfair, misleading, and/or deceptive labeling and advertising for the baby foods. Defendant is responsible for sourcing ingredients, manufacturing the products, and conducting all relevant quality assurance protocols, including testing, for the ingredients and finished baby foods.

28.    Defendant Campbell Soup Company ("Campbell") is incorporated in Delaware. Its headquarters and principal place of business is located at 1 Campbell Place, Camden, NJ 08103-1701.

29.    Defendant formulated, developed, manufactured, labeled, distributed, markets, advertised, and sold under the baby food brand name Plum Organics throughout the United States, including in this District, during the Class Period (defined below). The advertising, labeling, and packaging for these products, relied upon by Plaintiffs, was prepared, reviewed, and/or approved by Defendant and its agents and was disseminated by Defendant and its agents through marketing, advertising, packaging, and labeling that contained the misrepresentations alleged herein. The marketing, advertising, packaging, and labeling for these baby foods was designed to encourage consumers to purchase them and reasonably misled the reasonable consumer, i.e., Plaintiffs and the Class, into purchasing them. Defendant owns, manufactures, and distributes the baby foods and created, allowed, negligently oversaw, and/or authorized the unlawful, fraudulent, unfair, misleading, and/or deceptive labeling and advertising for the baby foods. Defendant is responsible for sourcing ingredients, manufacturing the products, and conducting all relevant quality assurance protocols, including testing, for the ingredients and finished baby foods.

30.    Defendant Gerber Products Company ("Gerber") (a/k/a Nestle Nutrition, Nestle Infant Nutrition or Nestle Nutrition North America) is incorporated in Michigan. Its headquarters and principal place of business is located at 1812 North Moore Street, Arlington, Virginia.

31.    Defendant formulated, developed, manufactured, labeled, distributed, markets, advertised, and sold under the baby food brand name Gerber throughout the United States, including in this District, during the Class Period (defined below). The advertising, labeling, and packaging for these products, relied upon by Plaintiffs, was prepared, reviewed, and/or approved by Defendant and its agents and was disseminated by Defendant and its agents through marketing, advertising, packaging, and labeling that contained the misrepresentations alleged herein. The marketing, advertising, packaging, and labeling for these baby foods was designed to encourage consumers to purchase them and reasonably misled the reasonable consumer, i.e., Plaintiffs and the Class, into purchasing them. Defendant owns, manufactures, and distributes the baby foods and created, allowed, negligently oversaw, and/or authorized the unlawful, fraudulent, unfair, misleading, and/or deceptive labeling and advertising for the baby foods. Defendant is responsible for sourcing ingredients, manufacturing the products, and conducting all relevant quality assurance protocols, including testing, for the ingredients and finished baby foods.

32.    Defendant The Hain Celestial Group, Inc. ("Hain") is incorporated in Delaware. Its headquarters and principal place of business is located at 1111 Marcus Avenue, #1, Lake Success, NY 11042.

33.    Defendant formulated, developed, manufactured, labeled, distributed, markets, advertised, and sold under the baby food brand name Earth's Best Organics throughout the United States, including in this District, during the Class Period (defined below). The advertising, labeling, and packaging for these products, relied upon by Plaintiffs, was prepared, reviewed,

and/or approved by Defendant and its agents and was disseminated by Defendant and its agents through marketing, advertising, packaging, and labeling that contained the misrepresentations alleged herein. The marketing, advertising, packaging, and labeling for these baby foods was designed to encourage consumers to purchase them and reasonably misled the reasonable consumer, i.e., Plaintiffs and the Class, into purchasing them. Defendant owns, manufactures, and distributes the baby foods and created, allowed, negligently oversaw, and/or authorized the unlawful, fraudulent, unfair, misleading, and/or deceptive labeling and advertising for the baby foods. Defendant is responsible for sourcing ingredients, manufacturing the products, and conducting all relevant quality assurance protocols, including testing, for the ingredients and finished baby foods.

34.    Defendant Nurture, Inc. ("Nurture") is incorporated in Delaware. Its headquarters and principal place of business is located at 40 Fulton Street, 17th Floor, New York, NY.

35.    Defendant formulated, developed, manufactured, labeled, distributed, markets, advertised, and sold under the baby food brand names Happy Baby and Happy Family throughout the United States, including in this District, during the Class Period (defined below). The advertising, labeling, and packaging for these products, relied upon by Plaintiffs, was prepared, reviewed, and/or approved by Defendant and its agents and was disseminated by Defendant and its agents through marketing, advertising, packaging, and labeling that contained the misrepresentations alleged herein. The marketing, advertising, packaging, and labeling for these baby foods was designed to encourage consumers to purchase them and reasonably misled the reasonable consumer, i.e., Plaintiffs and the Class, into purchasing them. Defendant owns, manufactures, and distributes the baby foods and created, allowed, negligently oversaw, and/or authorized the unlawful, fraudulent, unfair, misleading, and/or deceptive labeling and advertising

for the baby foods. Defendant is responsible for sourcing ingredients, manufacturing the products, and conducting all relevant quality assurance protocols, including testing, for the ingredients and finished baby foods.

## II.    JURISDICTION

36.    This Court has subject matter jurisdiction over this class action pursuant to 18 U.S.C. § 1964(a) (civil RICO jurisdiction), 18 U.S.C. § 1331 (federal question jurisdiction), and 28 U.S.C. § 1332(d)(2)(A) (CAFA jurisdiction).

37.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because Plaintiffs have suffered injury as a result of Defendants' acts in this District, many of the acts and transactions giving rise to this action occurred in this District, Defendants conduct substantial business in this District, Defendants have intentionally availed themselves of the laws, protections, and markets of this District, and Defendants are subject to personal jurisdiction in this District.

## III.    FACTUAL BACKGROUND

### A.  The baby food industry is a large, lucrative market driven by consumer demand for convenience and reassurances of safety.

38.    Baby food manufacturers know that there are few things as precious as a newborn baby and that all parents want the very best for their children. Baby food manufacturers also know that many parents are willing to pay premium dollars to ensure the quality and healthiness of the products they feed their babies.

39.    Given this universal demand, the world market for infant formula and baby food is large, growing, and very competitive with a forecast market value of almost $99 billion by 2024.[11]

---

[11] Emma Bedford, *U.S. baby food market - statistics & facts*, STATISTA (Nov. 20, 2020), https://www.statista.com/topics/1218/baby-food-market/.

40.     In the United States, the baby food market size was valued at $12.9 billion in 2018 and is projected to reach $17.2 billion by 2026.[12]

41.     Baby food is the most purchased baby product category in U.S. supermarkets.

42.     A market research group notes that "[i]n the recent years, packaged baby food has been widely adopted by parents since it provides convenience and higher nutrition level. In addition, the rise in awareness among people about the numerous health advantages of feeding baby food to infants has significantly fueled the growth of the baby food market."[13]

43.     The growth in the baby food market is also driven by rising numbers of women working outside the home: "As many working mothers return to their jobs shortly after giving birth, prepared baby foods and formulas provide an appealing alternative for working mothers, bridging their desires for healthy, nutritious food with their need for convenience."[14]

44.     The cereal segment of the baby food market has the largest revenue because infants consume these products on a regular basis as their high protein and vitamin content is necessary for overall growth.[15]

45.     A growing segment of this baby food market is baby food labeled as organic. In North America, the organic baby food market had a value of $1.9 billion in 2018. One market

---

[12] *U.S. Baby Food Market Expected to Grow with a CAGR of 3.7% from 2019 to 2026*, BUSINESS WIRE (Mar. 3, 2020, 05:44 AM), https://www.businesswire.com/news/home/20200303005477/en/U.S.-Baby-Food-Market-Expected-to-Grow-with-a-CAGR-of-3.7-from-2019-to-2026---ResearchAndMarkets.com.

[13] *Id.*

[14] *Oh, Baby! Trends in the Global Baby Food and Diaper Markets*, NIELSEN (Aug. 2015) https://www.nielsen.com/wp-content/uploads/sites/3/2019/04/Global20Baby20Care20Report20Revised20FINAL-2.pdf.

[15] *U.S. Baby Food Market Expected to Grow with a CAGR of 3.7% from 2019 to 2026*, BUSINESS WIRE (Mar. 3, 2020, 05:44 AM), https://www.businesswire.com/news/home/20200303005477/en/U.S.-Baby-Food-Market-Expected-to-Grow-with-a-CAGR-of-3.7-from-2019-to-2026---ResearchAndMarkets.com.

researcher concluded that the growth in the North America organic baby food market was driven in part by the "increasing awareness among parents regarding the baby's nutrition, coupled with the health benefits associated with organic food products" and "the rising consumer awareness about the harmful effects of chemicals on the infant's health."[16]

46.     Another market research group noted the strong growth of the organic market in North America: "Consumers are increasingly health conscious and looking for natural, minimally-processed foods, and the stakes are even higher when it comes to their babies." "More parents are seeking foods that set their children up for a healthy life—even if it comes at a premium. We expect this segment will continue to grow as more parents can afford to trade up."[17]

47.     According to a Consumer Reports survey, 39 percent of parents who purchased packaged foods sometimes bought organic food for their children, and they cited avoiding lead, arsenic, and other heavy metals as their primary reason for doing it.[18]

48.     While many millennial parents may have fewer children, market research shows they adopt a quality over quantity approach to the baby products they purchase. These parents prioritize organic and chemical-free baby products and are willing to pay a premium for healthy and high-nourishment meals.[19]

---

[16] *U.S. Baby Food Market Expected to Grow with a CAGR of 3.7% from 2019 to 2026*, BUSINESS WIRE (Mar. 3, 2020, 05:44 AM), https://www.businesswire.com/news/home/20200303005477/en/U.S.-Baby-Food-Market-Expected-to-Grow-with-a-CAGR-of-3.7-from-2019-to-2026---ResearchAndMarkets.com.

[17] *Oh, Baby! Trends in the Global Baby Food and Diaper Markets*, NIELSEN (Aug. 2015) https://www.nielsen.com/wp-content/uploads/sites/3/2019/04/Global20Baby20Care20Report20Revised20FINAL-2.pdf.

[18] Jesse Hirch, *Heavy Metals in Baby Food: What You Need to Know*, CONSUMER REPORTS (Aug. 16, 2018) https://www.consumerreports.org/food-safety/heavy-metals-in-baby-food/.

[19] *U.S. Baby Food Market Expected to Grow with a CAGR of 3.7% from 2019 to 2026*, BUSINESS WIRE (Mar. 3, 2020, 05:44 AM),

49.     Even parents who prefer low-cost options expect that all baby foods they buy will be safe and nutritious.[20]

50.     Parents look to endorsements from trusted sources like health experts in choosing baby food.

### B.  Arsenic, lead, cadmium, and mercury are toxic, hazardous substances.

51.     Heavy metals such as arsenic, lead, cadmium, and mercury are extremely toxic and dangerous to babies and young children.

52.     All four of the heavy metals (arsenic, lead, cadmium, and mercury) are defined by the Environmental Protection Agency as hazardous substances that may endanger public health and subject companies to strict liability clean-up and reporting requirements under the Comprehensive Environmental Response, Compensation, and Liability Act. Designation of Hazardous Substances, 40 C.F.R. § 302.4 (2019).

53.     Except for inorganic arsenic in infant rice cereal, no federal agency has determined that there is a safe level of these toxic heavy metals in baby food.

54.     The lack of any federal FDA mandated maximum contaminant level for baby food does not allow Defendants to simply ignore what research says about the harm associated with these high levels of heavy metals in baby food. Indeed, without action by the FDA, there has been no federal government determination of what levels of these hazardous neurotoxins (arsenic, lead, cadmium, and mercury) can be safely consumed by infants and children through regular

---

https://www.businesswire.com/news/home/20200303005477/en/U.S.-Baby-Food-Market-Expected-to-Grow-with-a-CAGR-of-3.7-from-2019-to-2026---ResearchAndMarkets.com.

[20] *Oh, Baby! Trends in the Global Baby Food and Diaper Markets*, NIELSEN (Aug. 2015) https://www.nielsen.com/wp-content/uploads/sites/3/2019/04/Global20Baby20Care20Report20Revised20FINAL-2.pdf.

consumption of baby food and snacks. Standards for these hazardous substances from other contexts indicate that the levels in Defendants' baby foods are not safe or healthy.

55.     This contamination, even in small amounts, can be especially dangerous for young children: "Infants are especially vulnerable because their bodies are so small, and on a per-pound basis, they're getting much higher exposure than anyone else in the population," according to Jane Houlihan, research director for Healthy Babies Bright Futures, discussing arsenic exposure in baby food in 2017.[21]

56.     A Healthy Babies 2019 Report also concluded that the exposure to these four heavy metals was particular harmful for infants and children: [22]

    a.   Arsenic, lead, mercury, and cadmium, four heavy metals found in the baby foods, are neurotoxins.

    b.   Exposures to these four heavy metals "diminish quality of life, reduce academic achievement, and disturb behavior, with profound consequences for the welfare and productivity of entire societies."

    c.   These four toxins "can harm a baby's developing brain and nervous system" and cause negative impacts such as "the permanent loss of intellectual capacity and behavioral problems like attention-deficit hyperactivity disorder (ADHD)."

    d.   Even in trace amounts found in food, these heavy metals can alter the developing brain and erode a child's IQ.

---

[21] Roni Caryn Rabin, *Should You be Worried About the Arsenic in Your Baby Food?,* THE NEW YORK TIMES (Dec. 7, 2017) https://www.nytimes.com/2017/12/07/well/eat/should-you-be-worried-about-the-arsenic-in-your-baby-food.html.

[22] Jane Houlihan & Charlotte Brody, *What's In My Baby's Food?*, HEALTHY BABIES BRIGHT FUTURES  (Oct. 2019), https://www.healthybabyfood.org/sites/healthybabyfoods.org/files/2019-10/BabyFoodReport_FULLREPORT_ENGLISH_R5b.pdf (attached as Ex. B).

e.   These four heavy metals pose "troubling risks for babies, including cancer and lifelong deficits in intelligence . . . ."

57.   The risk of exposure to heavy metals is exacerbated in babies and toddlers because they are small, have other developing organ systems, and absorb more of the heavy metals than adults.

58.   Because of how the effects of exposure to these heavy metals manifest, the potentially catastrophic effects on children who ate food produced by Defendants that contained these heavy metals might not be discovered for years to come.

### 1. Arsenic

59.   **Arsenic** is ranked number one among substances present in the environment that pose the most significant potential threat to human health, according to the Department of Health and Human Services' Agency for Toxic Substances and Disease Registry (ATSDR).[23]

60.   The known health risks of arsenic exposure include "respiratory, gastrointestinal, haematological, hepatic, renal, skin, neurological and immunological effects, as well as damaging effects on the central nervous system and cognitive development in children."[24]

61.   A study of Maine schoolchildren exposed to arsenic in drinking water found that children exposed to water with an arsenic concentration level greater than 5 parts per billion (ppb) "showed significant reductions in Full Scale IQ, Working Memory, Perceptual Reasoning and

---

[23] *ATSDR's Substance Priority List*, AGENCY FOR TOXIC SUBSTANCES AND DISEASE REGISTRY, (2019), www.atsdr.cdc.gov/spl/index.html#2019spl (last visited Mar. 3, 2021).

[24] The House Staff Report at 10, (citing Miguel Rodríguez-Barranco et al., *Association of arsenic, cadmium and manganese exposure with neurodevelopment and behavioural disorders in children: a systematic review and meta-analysis*, NATIONAL LIBRARY OF MEDICINE (June 1, 2013), https://pubmed.ncbi.nlm.nih.gov/23570911/)).

Verbal Comprehension scores." The authors noted that 5 ppb was an important exposure threshold.[25]

62.     The FDA acknowledged the grave dangers in consumption of high levels of arsenic by infants: "FDA's risk assessment shows that inorganic arsenic exposure during fetal development, infancy, and childhood may contribute to neurodevelopmental effects, as well as increase lifetime cancer risk, and that establishing an action level will reduce inorganic arsenic exposure and risk."[26]

63.     The Environmental Protection Agency has set the maximum contaminant level (MCL) for arsenic to 10 micrograms per liter (or 10 ppb) for public drinking water systems, as have the European Union and the World Health Organization.

64.     The FDA has already set maximum inorganic arsenic levels at 10 ppb for bottled water. FDA has also set the maximum amount of inorganic arsenic in infant rice cereals at 100 ppb.[27]

65.     Consumer Reports suggests setting inorganic arsenic levels as low as 3 ppb.

66.     Organizations such as Healthy Babies Bright Futures have called for a goal of no measurable amount of inorganic arsenic in baby food.

---

[25] *Id.* (citing Gail A. Wasserman et al., A cross-sectional study of well water arsenic and child IQ in Maine schoolchildren, BIOMED CENTRAL, INC. (Apr. 1, 2014), https://ehjournal.biomedcentral.com/articles/10.1186/1476-069X-13-23)).

[26] *Supporting Document for Action Level for Inorganic Arsenic in Rice Cereals for Infants*, U.S. FOOD & DRUG ADMINISTRATION (Aug. 5, 2020) https://www.fda.gov/food/chemical-metals-natural-toxins-pesticides-guidance-documents-regulations/supporting-document-action-level-inorganic-arsenic-rice-cereals-infants.

[27] *Drinking Water Requirements for States and Public Water Systems*, ENVIRONMENTAL PROTECTION AGENCY, www.epa.gov/dwreginfo/chemical-contaminant-rules (last visited Mar. 3, 2021); *Arsenic (Q&A)*, THE EUROPEAN FOOD INFORMATION COUNCIL (Dec. 8, 2014) www.eufic.org/en/food-safety/article/arsenic-qa); Arsenic, WORLD HEALTH ORGANIZATION (Feb. 15, 2018) https://www.who.int/news-room/fact-sheets/detail/arsenic.

### 2. *Lead*

67.     **Lead** is number two on ATSDR's list of substances present in the environment that pose the most significant potential threat to human health.[28]

68.     Even small doses of lead exposure are hazardous, particularly to children.[29] "Lead exposure is a particular health concern for fetuses, infants, and children because of their developing nervous system. In addition, infants and young children exhibit greater percentage of dietary lead absorption than do adults."[30]

69.     The Centers for Disease Control and Prevention maintains there is no known safe blood lead level in children. Even low levels of lead in blood have been shown to affect IQ, ability to pay attention, and academic achievement.[31]

70.     The FDA acknowledges that "even low-level chronic exposure" to lead "can be hazardous over time" because "lead can accumulate in the body."[32]

71.     Lead is associated with a range of negative health outcomes, including behavioral problems, decreased cognitive performance, delayed puberty, and reduced postnatal growth.

---

[28] *ATSDR's Substance Priority List*, AGENCY FOR TOXIC SUBSTANCES AND DISEASE REGISTRY, (2019), www.atsdr.cdc.gov/spl/index.html#2019spl (last visited Mar. 3, 2021).

[29] The House Staff Report at 11 (citing Philippe Grandjean, *Even low-dose lead exposure is hazardous*, NATIONAL LIBRARY OF MEDICINE (Sept. 11, 2010) https://pubmed.ncbi.nlm.nih.gov/20833288/).

[30] Brenna Flannery et al., *U.S. Food & Drug Administration's interim reference levels for dietary lead exposure in children and women of childbearing age*, 110 REGULATORY TOXICOLOGY & PHARMACOLOGY 104516 (2020).

[31] *Blood Levels in Children*, CENTERS FOR DISEASE CONTROL & PREVENTION (last reviewed Feb. 9, 2021), https://www.cdc.gov/nceh/lead/prevention/blood-lead-levels.htm (last visited Mar. 8, 2021).

[32] *Lead in Food, Foodwares, and Dietary Supplements*, U.S. FOOD & DRUG ADMINISTRATION (Feb. 27, 2020) https://www.fda.gov/food/metals-and-your-food/lead-food-foodwares-and-dietary-supplements.

72.    Half of blood lead exposure for most children between the ages of 1 and 6 comes from food.[33]



73.    FDA has set a 5-ppb lead standard for bottled water, WHO has set 10 ppb of lead as a provisional guideline for drinking water, and EPA has set an action level of 15 ppb for lead in drinking water. FDA has also set standards for lead in juice (50 ppb) and candy (100 ppb). The European Union has set the maximum lead level in infant formula to 20 ppb.

---

[33] Valerie Zartarian, Jianping Xue, Rogelio Tornero-Velez, and James Brown, *Supplemental Material, Children's Lead Exposure: A Multimedia Modeling Analysis to Guide Public Health Decision-Making*, ENV'L HEALTH PERSPECTIVES 97009-1 (Sept. 12, 2017).

74.     The FDA has also set an Interim Reference Level, the maximum daily intake level from food, of 3ppb for lead in children. The FDA also again noted that there has been "no safe level of lead exposure" yet "identified for children's health."[34]

75.     There is a growing consensus among health experts that lead levels in baby foods should not exceed 1 ppb. The American Academy for Pediatrics, the Environmental Defense Fund, and Consumer Reports have all, in some form, called for a 1 ppb level in food and drinks consumed by babies and children.

76.     Healthy Babies Bright Futures has called for a goal of no measurable amount of lead in baby food.

77.     Most children with any lead in their blood have no obvious immediate symptoms. Blood tests are a simple and readily available way to assess a person's exposure to lead. According to the CDC, early identification of elevated blood lead levels is key to reducing the long-term effects of lead exposure.[35]

78.     While regulation can minimize dietary lead exposure, it can also be minimized "through surveillance of lead concentrations in food, and adjustment of manufacturing processes."[36]

---

[34] Brenna Flannery et al., *U.S. Food & Drug Administration's interim reference levels for dietary lead exposure in children and women of childbearing age*, 110 REGULATORY TOXICOLOGY & PHARMACOLOGY 104516 (2020).

[35] *Blood Levels in Children*, CENTERS FOR DISEASE CONTROL & PREVENTION (last reviewed Feb. 9, 2021), https://www.cdc.gov/nceh/lead/prevention/blood-lead-levels.htm (last visited Mar. 8, 2021).

[36] Brenna Flannery et al., *U.S. Food & Drug Administration's interim reference levels for dietary lead exposure in children and women of childbearing age*, 110 REGULATORY TOXICOLOGY & PHARMACOLOGY 104516 (2020).

### 3. Cadmium

79.     **Cadmium** is number seven on ATSDR's list of substances present in the environment that pose the most significant potential threat to human health.[37]

80.     Cadmium is associated with decreases in IQ, as well as the development of attention deficit hyperactivity disorder (ADHD).

81.     EPA has a limit of 5 ppb of cadmium in drinking water, and FDA similarly has set a limit of 5 ppb in bottled water. The World Health Organization has set its limit for cadmium in drinking water at 3 ppb. The EU has set a limit ranging from 5–20 ppb cadmium for infant formula.

82.     Groups like Healthy Babies Bright Futures have set a goal of no measurable amount of cadmium in baby food. Consumer Reports has called for a limit of 1 ppb cadmium in fruit juices.

### 4. Mercury

83.     **Mercury** is number three on ATSDR's list of substances present in the environment that pose the most significant potential threat to human health.

84.     EPA has capped mercury in drinking water at 2 ppb.

85.     Consumer advocates urge even stricter standards for baby food. For example, Healthy Babies Bright Futures has called for a goal of no measurable amount of mercury in baby food.

---

[37] *ATSDR's Substance Priority List*, AGENCY FOR TOXIC SUBSTANCES AND DISEASE REGISTRY, (2019), www.atsdr.cdc.gov/spl/index.html#2019spl (last visited Mar. 3, 2021).

**C. Defendants have known for years that their baby food products contained or could contain unsafe levels of heavy metals.**

86.    For years, Defendants have been aware that their products contain dangerous levels of heavy metals, yet they have failed to take action to minimize the amount of toxins in foods that would eventually be consumed by young children, toddlers, and infants.[38]

87.    On June 15, 2017, the Environmental Defense Fund released a report demonstrating that lead had been frequently detected in baby foods. In fact, 20% of baby food samples tested by the Food and Drug Administration from 2003 to 2013 contained lead.[39] Lead was most commonly found in grape (89%), mixed fruit (67%), apple (55%), and pear (45%) juices; sweet potatoes (86%); carrots (43%); arrowroot cookies (64%); and teething biscuits (47%).

88.    In October 2017, a non-profit organization called Clean Label Project (a nonprofit focused on "bring[ing] truth and transparency to food and consumer product labeling"[40]) released findings from a study showing contaminants such as arsenic, lead, and mercury in leading brands of infant formula and baby foods. Clean Label Project purchased baby foods available in grocery stores across America and independently tested them. The Clean Label Project report noted:

    a.    Over 30 percent of infant formulas and baby foods contained lead as well as many other contaminants, including arsenic and mercury;

---

[38] *See* Sally Kuzemchak, *Everything You Need to Know About Heavy Metals and Contaminants in Baby Food*, PARENTS (Feb. 4, 2021) https://www.parents.com/recipes/scoop-on-food/clean-label-project-study-finds-contaminants-in-formula-baby-food/.

[39] Press Release, Environmental Defense Fund, EDF Report Finds Lead in 1 in 5 Baby Food Samples (June 15, 2017), available at https://www.edf.org/media/edf-report-finds-lead-1-5-baby-food-samples.

[40] *Our Mission*, CLEAN LABEL PROJECT, https://cleanlabelproject.org/about-us/#our-mission (last visited Mar. 3, 2021).

    b.   Over 20 percent of all products tested exceeded at least one state or federal guideline for contaminants;

    c.   Some products labeled "certified organic" actually had higher amounts of mercury and lead than conventional baby foods, although the organic baby foods had fewer pesticides;

    d.   Rice-based "puff" snacks had on average over 5 times as much arsenic as other baby snacks.[41]

89.    Defendants' products were included as the worst in the baby food categories:[42]

    a.   Defendant Gerber: (1) Gerber DHA & Probiotic Rice Cereal with Vitablocks was identified as one of the bottom five baby cereals; (2) Gerber 3rd Foods Banana Apple Strawberry with Lil' Bits and 3rd Foods Mixed Carrots, Corn and Butternut Squash with Lil' Bits were identified as two of the bottom five jar meals; (3) Gerber Graduates Grabbers Apple & Sweet Potato with Cinnamon Squeezable Fruit & Veggies was identified as one of the bottom five pouches; (4) Gerber Graduates Lil' Biscuits Vanilla Wheat Biscuits was identified as one of the bottom five snacks.

    b.   Defendant Hain: (1) Earth's Best Organic Whole Grain Rice Cereal was identified as one of the bottom five baby cereals; (2) Earth's Best Stage 2- Organic Apple Raisin Flax & Oat Wholesome Breakfast was identified as one of the bottom five pouches.

---

[41] *What are You Really Feeding Your Baby?*, CLEAN LABEL PROJECT (Oct. 25, 2017) https://cleanlabelproject.org/blog-post/clp-infant-formula-baby-food-test/.

[42] *Infant Formula and Baby Food Project Summary*, CLEAN LABEL PROJECT, https://web.archive.org/web/20171027011929/http://www.cleanlabelproject.org/product-ratings/infant-formula-baby-food/#top-ten (last visited Mar. 3, 2021).

      c.   Defendant Campbell: Plum Organics Stage 2 Apple & Carrot Organic Baby Food was identified as one of the bottom five pouches.

      d.   Defendant Nurture: Happy Baby Organic Teethers Sweet Potato and Banana Gentle Teething Wafers was identified as one of the bottom five snacks.

90.    The following year, in 2018, *Consumer Reports* analyzed 50 nationally distributed baby and toddler foods for arsenic, lead, cadmium, and mercury. Consumer Reports tested products from Defendants Beech-Nut, Gerber, Campbell, Hain, and Nurture. It found that 68 percent of tested products had worrisome levels of at least one of these metals, and over 25 percent would pose a risk to a child who only ate one serving or less per day.[43]

91.    Consumer Reports' testing showed that all the samples of Defendant Beech-Nut's Classics Sweet Potatoes, Defendant Hain's Earth's Best Organic Sweet Potatoes, and Defendant Gerber's Turkey & Rice had concerning levels of lead. Consumer Reports sent its findings to these Defendants. Defendant Gerber went back and tested samples of its turkey and rice dinner from the same three batches CR tested. The company said it got similar results and that it was "reviewing our protocols for further improvement." Defendant Beech-Nut did not detect lead in its independent testing but noted that based on an internal investigation, the company was upgrading the requirements for its third-party lab testing.[44]

---

[43] Jesse Hirch, *Heavy Metals in Baby Food: What You Need to Know*, CONSUMER REPORTS (Aug. 16, 2018) https://www.consumerreports.org/food-safety/heavy-metals-in-baby-food/; *see also, CR renews call for FDA and manufacturers to take action to keep infants and children safe from heavy metals in foods*, CONSUMER REPORT (Feb. 4, 2021) https://advocacy.consumerreports.org/press_release/cr-renews-call-for-fda-and-manufacturers-to-take-action-to-keep-infants-and-children-safe-from-heavy-metals-in-foods/.

[44] Jesse Hirch, *Heavy Metals in Baby Food: What You Need to Know*, CONSUMER REPORTS (Aug. 16, 2018) https://www.consumerreports.org/food-safety/heavy-metals-in-baby-food/.

92.     Consumer Reports also calculated a daily limit for certain of Defendants' products to determine the number of servings a child would need to eat for the food to pose potential health risks from exposure to the three heavy metals. All Defendants had products where the daily limit for that product was less than one serving per day.[45]

93.     The Consumer Reports study indicated that products with rice were particularly susceptible to dangerous heavy metal contamination. Additionally, as a category, snack foods— bars, cookies, crackers, crunches, crisps, puffs, and rice rusks and other teething biscuits—were the most problematic. Consumer Reports noted that this was particularly concerning because "snacks are also the most common type of packaged product that babies and toddlers eat, according to CR's recent survey. Seventy-two percent of parents said they feed their child at least one of the types of snack foods we tested."[46]

94.     Consumer Reports also found that organic baby foods were just as likely to contain heavy metals as those from conventional farms.

95.     The Consumer Reports' researchers noted: "Babies and toddlers are particularly vulnerable due to their smaller size and developing brains and organ systems. They also absorb more of the heavy metals that get into their bodies than adults do."[47]

96.     In its 2018 report, Consumer Reports also concluded that children's food manufacturers could reduce the heavy metal content of their products.

---

[45] Jesse Hirch, *Heavy Metals in Baby Food: What You Need to Know*, CONSUMER REPORTS (Aug. 16, 2018) https://www.consumerreports.org/food-safety/heavy-metals-in-baby-food/.

[46] Jesse Hirch, *Heavy Metals in Baby Food: What You Need to Know*, CONSUMER REPORTS (Aug. 16, 2018) https://www.consumerreports.org/food-safety/heavy-metals-in-baby-food/.

[47] Jesse Hirch, *Heavy Metals in Baby Food: What You Need to Know*, CONSUMER REPORTS (Aug. 16, 2018) https://www.consumerreports.org/food-safety/heavy-metals-in-baby-food/

97.    These alarm bells sounded again in October 2019 when Healthy Babies Bright Futures released a report detailing that dangerous levels of toxic heavy metals were found in **95 percent of baby food**.[48] The Healthy Baby study tested products from all Defendants and provided their findings publicly.



98.    The Healthy Baby Report showed concerning levels of these toxic heavy metals in products from all Defendants including:

    a.    Defendant Beech-Nut: rice cereal (>100ppb arsenic, >5ppb cadmium)

    b.    Defendant Campbell: Snacks - Other (>35ppb arsenic, >20ppb cadmium)

    c.    Defendant Gerber: rice cereal (>100ppb arsenic, >10ppb cadmium, >2ppb mercury)

    d.    Defendant Hain: rice cereal (>100ppb arsenic, >15ppb lead, >10ppb cadmium, >2ppb mercury)

    e.    Defendant Nurture: snacks – puffs (>80ppb arsenic, >5ppb lead, >10ppb cadmium, >2ppb mercury)

---

[48] Jane Houlihan & Charlotte Brody, *What's In My Baby's Food?*, HEALTHY BABIES BRIGHT FUTURES  (Oct. 2019), https://www.healthybabyfood.org/sites/healthybabyfoods.org/files/2019-10/BabyFoodReport_FULLREPORT_ENGLISH_R5b.pdf (attached as Ex. B) (emphasis added).

99.     Four of seven infant rice cereals tested in the Healthy Baby study contained inorganic arsenic in excess of the FDA's action level.

100.    The Healthy Baby Report noted that a study by a nationally-recognized toxicology and economic research firm estimated that lead and arsenic in rice-based foods account for one-fifth of the more than 11 million IQ points children lose from birth to 24 months of age from all dietary sources. Based on this risk, Healthy Babies Bright Futures concluded that baby food companies needed to—and could—take swift action to reduce arsenic levels in rice-based foods.

101.    In August 2020, the Clean Label Project released an updated report, finding that nothing had changed. Of the 530 baby and toddler food products tested, "[t]he results of the baby food study were shocking": lead was detected in 36 percent of products, cadmium in 58 percent, and arsenic in 65 percent.[49] Certified organic products were found to have twice the amount of arsenic than conventional products.

102.    In its August 2020 report, the Clean Label Project again called for manufacturers to test for heavy metals "to ensure that their product is safe and wholesome."[50]

103.    As Healthy Babies Bright Futures reported in 2017, because rice is grown in water, it absorbs up to 10 times more inorganic arsenic from soil minerals than other crops. Other grain products, like oat- or wheat-based cereals, have been found to contain far lower levels of arsenic.

---

[49] *Baby Food: A Puree of Plasticizers and Heavy Metals*, CLEAN LABEL PROJECT (Aug. 10. 2020) https://cleanlabelproject.org/baby-food-white-paper/. Attached as Exhibit C.

[50] *Id.*

104.    While some heavy metals are naturally occurring, manmade products such as chemical fertilizers, pesticides, and untreated wastewater are responsible for large concentrations of heavy metals in agricultural sites, where they are absorbed by crops.[51]

**D.  Despite Defendants' knowledge of heavy metal contamination, they concealed the truth and also misled consumers about the safety of their products and the veracity of watchdog reports through press releases, the creation of industry groups, and advertising.**

105.    Knowing that consumers valued the quality and safety of the baby food products they fed their children, Defendants misrepresented the health, safety, and contents of their products and omitted information about the testing that showed risky levels of toxic heavy metals.

106.    Each Defendant engaged in a scheme to defraud through a series of false representations, fraud by omission, fraud by half-truth, and/or fraudulent concealment.

***1.  After consumer watchdog reports broke, Defendants released intentionally misleading statements to lull consumers and regulators into inaction.***

107.    On December 11, 2017, after the release of the Clean Label Project report, Defendant **Campbell** stated: "**We believe that Plum's products are safe to eat**. Our testing confirmed that the **averaged results** for heavy metals in all tested Plum products gave concentrations that are typical for those ingredients – whether that's a leafy green grown in your own garden or a bunch of carrots purchased at the farmer's market. The results also demonstrate our tested products are below exposure limits set by **certain** domestic and international regulatory bodies."[52]

---

[51] Atafar Z, Mesdaghinia A, Nouri J, Homaee M, Yunesian M, Ahmadimoghaddam M, Mahvi AH. *Effect of fertilizer application on soil heavy metal concentration*, 160 Env'l Monitoring & Assessment 83 (2010).

[52] *Plum's Updated Response to Clean Label Project Report,* PLUM ORGANICS (Dec. 11, 2017) https://www.plumorganics.com/plums-response-clean-label-report/ (emphasis added).

108.    Notably, however, Defendant Campbell purposefully did not state which of these "certain domestic and international regulatory bodies" it was referring to, and its reference to "averaged results" was deliberately misleading and fraud by half-truth because it did not explain what exact numbers were averaged together.

109.    In 2018, when Consumer Reports reported on its independent testing showing Beech-Nut baby foods also included worrisome levels of toxic heavy metals, **Beech-Nut** sought to downplay the reports and assured parents that its baby foods were "healthy, nutritious and safe" and that it had already taken the recommended actions. It also inaccurately stated that "no government standard or recommendation exists for lead."[53] On August 16, 2018, this press release was also picked up by news media sites and relayed to the public.[54]

---

[53] *Beech-Nut Response to the Recent Consumer Reports Article on Baby Food*, BEECH-NUT, https://www.beechnut.com/response-recent-consumer-reports-article/ (last visited Mar. 3, 2021).

[54] Thomas Barrabi, *Baby food brands contain 'worrisome' level of toxic metals: Gerber, Beech-Nut respond*, FOX BUSINESS (Aug. 16, 2018), https://www.foxbusiness.com/markets/baby-food-brands-contain-worrisome-level-of-toxic-metals-gerber-beech-nut-respond.

**Beech-Nut Response to the Recent Consumer Reports Article on Baby Food**

We want to reassure parents that Beech-Nut's real food for babies is healthy, nutritious and safe. Our focus is on the safety and quality of the food we prepare for infants and toddlers.

The Consumer Reports baby food article recommends specific actions for manufacturers, including sourcing produce from areas less likely to be contaminated, and ensuring water and equipment used for manufacturing don't contribute to contamination. These actions have been an important part of Beech-Nut's quality and safety process for many years. We also want to assure parents that there is not a recall on any of our products, and we have high confidence in the quality and standards we use in making our food.

All produce – even the highest quality, organic and non-GMO fruits and vegetables you buy at the grocery store or a farmer's market – contain very tiny levels, or trace amounts, of lead and other elements because they exist naturally in soil, air and water. Our goal is and always has been to minimize the trace amounts of heavy metals in our products. Certain ingredients, like sweet potatoes and rice, are especially vulnerable because of their growing conditions.

Currently, no government standard or recommendation exists for lead. We continue to advocate for a government standard or recommendation for lead level, and we would welcome the opportunity to work with the FDA on science-based standards that food suppliers can implement across our industry.

Please visit our Food Quality & Safety page for more information on our food quality standards.

110.    Similarly, in 2018, as Consumer Reports revealed its independent testing showing Gerber baby foods also included worrisome levels of toxic heavy metals, **Gerber** sought to downplay the reports and assured parents in a statement that was published on August 16, 2018 that "[a]ll of our foods meet our safety and quality standards, which are among the strictest in the world." "Our rigorous standards are developed by evaluating the latest food safety guidance – from sources like the Food and Drug Administration, Environmental Protection Agency, and international health authorities. Gerber also partners with our farmers and our ingredient and packaging suppliers to control, reduce and limit contaminants in all our foods."[55]

111.    The 2019 Healthy Baby report prompted another deceptive statement sent by Defendant Beech-Nut through the interstate wires to consumers across the country. Defendant

---

[55] Thomas Barrabi, *Baby food brands contain 'worrisome' level of toxic metals: Gerber, Beech-Nut respond*, FOX BUSINESS (Aug. 16, 2018), https://www.foxbusiness.com/markets/baby-food-brands-contain-worrisome-level-of-toxic-metals-gerber-beech-nut-respond.

**Beech-Nut** represented to consumers that "[o]ur process starts with high-quality fruits and vegetables that meet BNN's own standards, which in some cases are **10 times stricter than those of the U.S. government**. For example, we test for 255 common contaminants, such as lead, other heavy metals and pesticides, to confirm that all the ingredients delivered to us and used in our products comply with our standards.  If they don't, we send them back."[56] This statement was false and misleading because there are no identified standards "of the U.S. government" that are cited to substantiate this comparison, let alone any that are 10 times less strict. Likewise, there is no factual detail to confirm the testing of the 255 common contaminants, and Defendants' statement does not address contamination during the manufacturing process or with final products.

### 2. Using Big Tobacco's playbook, Defendants rush to create the Baby Food Council and each uses it as a vessel for fraud.

112.    As Congress began to investigate Defendants' wrongdoing in late 2018, Defendants turned to one of Big Tobacco's proven tricks: creating a seemingly independent and pro-consumer entity that suggested they were actually committed to stopping the very fraud they were directing and perpetrating. This new entity was called the Baby Food Council.

113.    The Baby Food Council was created in January 2019 only after congressional investigations began. It was put together quickly as a front organization by Defendants to mislead and deflect attention away from their ongoing fraud.

114.    This deceptive maneuver by Big Food was borrowed directly from the playbook of Big Tobacco, which decades earlier had employed public relations experts, lawyers, and lobbyists who worked to deceive the American public regarding the dangers of smoking:

> In December 1953, the CEOs of the major tobacco companies met secretly in New York City. Their purpose was to counter the damage from studies linking smoking

---

[56] *Baby Food Council Commits to Food Safety*, BEECH-NUT (Oct. 17, 2019), https://www.beechnut.com/baby-food-council/ (emphasis added).

to lung cancer. A year earlier Reader's Digest—then the public's leading source of medical information—had printed an article entitled "Cancer by the Carton" (Norr 1952). After it appeared, cigarette sales plummeted for two years, the first such decline of the century except during the Great Depression.

Working closely with John Hill, the founder of the public relations giant Hill & Knowlton, the industry created "A Frank Statement to Cigarette Smokers" and paid to have it published in 448 newspapers on January 4, 1954. To give the industry a human face, the statement included the signatures of the nation's top tobacco executives and assured Americans that "we accept an interest in people's health as a basic responsibility, paramount to every other consideration in our business." Furthermore, they promised that "we always have and always will cooperate closely with those whose task it is to safeguard the public's health" (Tobacco Industry Research Committee 1954).

The "Frank Statement" was a charade, the first step in a concerted, half-century-long campaign to mislead Americans about the catastrophic effects of smoking and to avoid public policy that might damage sales. Unearthed later, industry documents showed the repeated duplicity of its executives. Everything was at stake. The industry wanted desperately to prevent, or at least delay, shifts in public opinion that would permit a barrage of legislative, regulatory, and legal actions that would erode sales and profits.[57]

115.    Tobacco executives deliberately engineered deception using a pro-consumer front group as a form of misdirection and concealment; they would give money to seemingly independent universities so they could control the research and, more important, any results that were released. Big Tobacco realized that the "best public relations approach was for the industry to become a major sponsor of medical research. This tactic offered several essential advantages. The call for new research implied that existing studies were inadequate or flawed. It made clear that there was more to know, and it made the industry seem a committed participant in the scientific enterprise rather than a self-interested critic."[58]

---

[57] Kelly D. Brownell & Kenneth E. Warner, *The Perils of Ignoring History: Big Tobacco Played Dirty and Millions Died. How Similar Is Big Food?*, MILBANK QUARTERLY (Mar. 2009), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2879177/.

[58] Allan Brandt, *Inventing Conflicts of Interest: A History of Tobacco Industry Tactics*, AM. J. PUBLIC HEALTH (Jan. 2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3490543/.

116.     In other words, Big Tobacco created "a research program that would be controlled by the industry yet promoted as independent. This was a public relations masterstroke. [Big Tobacco executives] understood that simply giving money to scientists—through the National Institutes of Health or some other entity, for example—offered little opportunity to shape the public relations environment. However, offering funds **directly to university-based scientists** would **enlist their support and dependence**. Moreover, it would have the added benefit of making academic institutions 'partners' with the tobacco industry in its moment of crisis."[59]

117.     "Individual companies and entire industries have been playing and fine-tuning this strategy for decades, disingenuously demanding *proof over precaution* in matters of public good. For industry, there is no better way to stymie government efforts to regulate a product that harms the public or the environment; debating the science is much easier and more effective than debating the policy."[60]

118.     In this strategy of "manufacturing doubt," "the main motivation all along has been only to sow confusion and buy time, sometimes lots of time, thereby allowing entire industries to thrive or individual companies to maintain market share while developing a new product. . . . [T]hey can do the math: they have also been *making* a lot of money for all those years. Their wealth compounds."[61]

119.     This is the exact pathway taken by Defendants in this case through the creation of the Baby Food Council and the university professors on its payroll.

---

[59] *Id.* (emphasis added).

[60] David Michaels, The Triumph of Doubt: Dark Money and the Science of Deception 4 (2020).

[61] *Id.* at 5.

120.    The food industry (Big Food) has already been exposed for following the Big

Tobacco playbook:

> The tobacco team had **a playbook—a master plan and script that directed the**
> **behavior of industry executives, lobbyists, lawyers, scientists, and government**
> **officials friendly to the industry**. In A Question of Intent, a former FDA
> commissioner, David Kessler (2001, p. xiii), wrote:
>
>> Devised in the 1950s and '60s, the tobacco industry's strategy was
>> embodied in a script written by the lawyers. Every tobacco company
>> executive in the public eye was told to learn the script backwards
>> and forwards, no deviation was allowed. The basic premise was
>> simple—smoking had not been proved to cause cancer. Not proven,
>> not proven, not proven—this would be stated insistently and
>> repeatedly. Inject a thin wedge of doubt, create controversy, never
>> deviate from the prepared line. It was a simple plan and it worked.
>
> The **food industry appears to have a strategy as well**, repeatedly carried to the
> public by spokespersons from food companies, trade associations, and their
> political allies.[62]

121.    As part of Big Food, the baby food industry has taken these same techniques,

proven to work by Big Tobacco and already used by Big Food to beat back proof that bad foods

cause obesity, and applied them to baby food manufacturing, sales, and marketing.

122.    Big Tobacco was stopped only by a civil RICO claim that broke apart the corrupt,

coordinated corporate behavior that centered on fraudulent sales, marketing, and advertising of

tobacco products to American purchasers. In an August 2006 judgment, a federal court ruled that

several tobacco companies "systematically defrauded the American people by lying for decades

about, among other things, the health effects of smoking and their marketing to children."[63]

---

[62] Kelly D. Brownell & Kenneth E. Warner, *The Perils of Ignoring History: Big Tobacco Played Dirty and Millions Died. How Similar Is Big Food?*, MILBANK QUARTERLY (Mar. 2009), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2879177/ (emphasis added).

[63] *Big Tobacco finally forced to tell the truth about its deadly products through court-ordered ads*, TRUTH INITIATIVE (Nov. 27, 2017), https://truthinitiative.org/press/press-release/big-tobacco-finally-forced-tell-truth-about-its-deadly-products-through-court.

i.  **Defendants Are Using the Baby Food Council to Inappropriately Lull Consumers and Regulators into Inaction**

123.    Defendants Beech-Nut, Hain, Campbell, and Gerber as well as Defendant Nurture's parent company, Danone, are mimicking Big Tobacco by creating and using the Baby Food Council. Until the site of the Baby Food Council was recently scrubbed, a website hosted by the food science department of Cornell University claimed: "the Baby Food Council is a group of infant and toddler food companies" (supported by other entities) that was "created in January 2019."[64]

124.    According to the Baby Food Council charter from May 21, 2019, its members as of April 15, 2019, included Cornell University and the Defendants: Beech-Nut, Campbell, Hain, Gerber, and Nurture's brand, Happy Family Organics.

125.    Through the charter, these members agreed to "[t]reat the heavy metals as an unavoidable contaminant that should be manageable by admitting their presence, acknowledging no safe level in the food supply, and striving to drive the levels as low as reasonably achievable using best-in-class management practices."

126.    The members also acknowledged that the FDA had previously suggested not looking at one food at a time but looking at overall exposure based on a child's complete diet.

127.    When it was formed, Defendants stressed their involvement in a joint press release issued on October 17, 2019, through the Environmental Defense Fund.[65]

---

[64] *CIFS-IPP Councils*, Cornell College of Agriculture & Life Sciences, Industry Engagement, https://foodscience.cals.cornell.edu/industry-partnership-program/cifs-ipp-councils/; archived Feb. 25, 2021 at WAYBACK MACHINE, https://web.archive.org/web/20210225020557/https://foodscience.cals.cornell.edu/industry-partnership-program/cifs-ipp-councils/.

[65] Press Release, Baby Food Council, The Baby Food Council is taking on the challenge of reducing heavy metals in young kids' food (Oct. 17, 2019), https://www.edf.org/media/baby-food-council-taking-challenge-reducing-heavy-metals-young-kids-food.

a. Jason Jacobs, Vice President of Food Safety & Quality for Defendant **Beech-Nut**, stated: "Being a dad, I understand the need for safe food. Beech-Nut cares deeply about the safety of all food – not just baby food – and that's why we were a founding member of the Baby Food Council. We're committed to working together to bring sustainable change in this important environmental issue."

b. Annalisa Fornarelli, Vice President of Global Food Safety and Quality for Defendant **Campbell**, stated: "Plum Organics is proud to be a member of the Baby Food Council. As part of the Council, we share the same overall goal of our industry partners, and that is to provide safe and high-quality products to babies and toddlers. Plum's mission is to provide all little ones with the very best food from the very first bite."

c. Joel Lim, M.D., Medical Director for Defendant **Gerber**, stated: "Gerber has always put babies and toddlers first, but we never stop asking ourselves, 'Can we do more?' This question inspires our commitment to continuously raise our high standards and improve our methods to reduce and limit contaminants in all our foods. We're excited to be partnering with like-minded organizations who are also committed to improving the safety and quality of food for little ones."

d. Raul Fajardo, Senior Vice President of Technical Services for Defendant **Hain**, stated: "Although heavy metals are naturally occurring in the environment, we are always looking to reduce their presence in food. Earth's Best is excited to partner with the members of the Baby Food Council to support this important initiative."

e. Jason Rosecast, Vice President of Quality and Food Safety for Defendant **Nurture**, stated: "At Happy Family Organics, our mission is, and always has been, to change

the trajectory of children's health through nutrition. Being a founding member of and contributor to the Baby Food Council reinforces our commitment to create the best possible foundation for young children to realize their potential to lead a happy and healthy life. This is a great challenge in which many stakeholders across our industry need to work together, and we all share in the responsibility to do so."

128.    Including Cornell University as a member (and having it host the website) is a move taken directly out of the playbook of Big Tobacco by using university-based scientists and partnering with academic institutions to further Defendants' schemes. Further, there is good reason to infer that the baby food industry is paying significant money to either Cornell University's food science department and/or the professors at Cornell who are running the Baby Food Council. Discovery is needed to uncover the wire transfers and bank account statements of these professors and Cornell University.

129.    The timing of the Baby Food Council's creation in 2019 raises red flags. The Cornell University professors and food science department cannot demonstrate any prior involvement in baby food safety, nor can they show why they coincidentally chose to jump on board this project in January 2019—right as investigators were closing in on the food fraud schemes of the Defendants and public outcries were starting to surface.

130.    Despite being involved in the Baby Food Council, Defendants knowingly violate several of the stated tenets of the Baby Food Council and take positions contradicted by the Council:

    a.    First, the Baby Food Council affirmatively states that any exposure to contaminated foods is unacceptable because "there is no known safe level of exposure" for babies:

> **Analysis of Baby Food Products for Heavy Metals**
>
> A best practice to reduce heavy metals in vegetable and fruit purees is to regularly test ingredients and products for low levels of arsenic, cadmium, and lead to be able to identify and resolve potential problems. Accordingly, the FDA and food industry regularly test foods for various heavy metals, including arsenic, cadmium, and lead. These common food contaminants occur naturally or from pollution in the environment. Organic and conventional crops alike absorb them from soil and water. Their presence in baby food raises is a concern because babies are more sensitive to their harmful impacts. There is no known safe level of exposure to these metals; hence even low levels of contamination are a concern.

    b. Second, the Baby Food Council website states that it is also important to test "ingredients **and products**"—not simply each ingredient in isolation. Defendants violate this tenant by willfully testing only individual ingredients in isolation as an effort to sidestep the contamination of the products. Of course, babies ingest products, not ingredients in isolation, which renders this type of testing a sham.

    c. Third, the website refers to proper procedures for testing for "arsenic, cadmium, and lead"—yet Defendants did not follow these guidelines when knowingly manufacturing products with contaminants.

131.    Because of their financial contributions, Defendants were able to influence the content of the Council's website in at least two ways:

    a. First, the Baby Food Council website falsely states that "contaminants naturally occur"—an obviously false statement that was included to mislead purchasers into believing the contamination in their food cannot be mitigated when in fact it can. Indeed, "[t]oxic metals might be more common in baby foods because of the vitamins and minerals added to those foods during processing," according to Michael Hansen, senior staff scientist at Consumer Reports.

b.  Second, the website ignores mercury as a dangerous heavy metal that is
    included in baby food as a contaminant. The Council website speaks only to
    arsenic, cadmium, and lead—it leaves out mercury entirely, even though
    mercury is a well-known toxin present in baby food.

132.   Prior to 2021, Defendant Campbell left the Baby Food Council for unexplained
reasons.

ii.   **A Dormant Entity**

133.   If it was not created by Defendants as a vessel for fraud, the Baby Food Council
appears to have been infiltrated and taken over by Defendants. Several factors suggest this has
occurred.

134.   First, despite being formed in January 2019, the Council has taken no meaningful
steps toward solving the issue of heavy metals in baby food. Further, the Council cannot point to
any activity it has taken that is contrary to the corporate interests of its members, including
Defendants. In particular, the Baby Food Council has done nothing to further actual government
standards that might actually restrict the food fraud and contamination that Defendants are all
engaging in.

135.   Second, if the Baby Food Council was legitimately concerned with baby food, it
would have, at a minimum, commented upon the practices of Defendants following the release of
the February 2021 congressional study. Or, at the very least, it would have issued some statement
regarding this bombshell, front page national news event. But the Baby Food Council, as of the
time of filing, has said nothing about these recent congressional findings.

136.   Third, its website is hosted by the Food Science Department of Cornell University,
which is odd because Cornell is merely a member of the Baby Food Council but does not own or
operate the entity on its own. Further discovery is needed for Plaintiffs to uncover the financial

payments made by Defendants to Cornell and its faculty and any other connections between Defendants and Cornell and its food science department, including the professor listed on the Baby Food Council webpage (Professor Rui Hai Liu). These financial contributions, if they exist, are not disclosed or made transparent in a public manner either by Cornell or Professor Hai Liu, which (if they exist) is further evidence of concealment and intent to defraud.

137.    Fourth, the Council has virtually no online presence. Its members frequently tout their membership as a defense to the fact they are engaging in food fraud, but the Council does nothing. It issues no press releases, no guidance, no newsletter, no updates, no safety alerts—nothing. Thus, Defendants are engaging in a sham campaign to get consumers to believe they are doing good through the Council when in fact the Council is a dormant entity captured and funded entirely by Defendants.

138.    Fifth, the Council waited 10 months (from January to October 2019) before doing or saying anything, and it finally did something only because it knew that its food manufacturer members (Defendants) were about to be hammered for major food fraud violations:

October 17, 2019

**FOR IMMEDIATE RELEASE**

(Washington, D.C. – October 17, 2019) Today, the Baby Food Council, a broad-based group of companies and other organizations formed in January 2019, announced its efforts to take on the challenge of reducing heavy metals in young children's food. This news comes as Healthy Babies Bright Futures (HBBF), a children's health advocacy group and member of the Council, released a new report demonstrating that tests on over 150 foods consumed by babies and toddlers found that 95% of the products tested had detectable levels of heavy metals. Recognizing that heavy metals are widely present in the environment and can get into food, the Council seeks to reduce levels of heavy metals in food products to as low as reasonably achievable using best-in-class management techniques.

139.    This press release directly connects the Baby Food Council's activity to the incriminating Healthy Baby Bright Futures report that was about to be issued. Had the Healthy Baby Bright Futures report not been released, the Council would have taken no action. And even then, from October 2019 to present, nothing has changed. The Council and Defendants have not alerted purchasers that their food is contaminated, nor have they corrected their false advertising, recalled any of their defective products, or disproven the allegations that they are engaging in food fraud.

140.    This 2019 release was not news to Defendants or the Council. At least by 2018, Defendants and the Council knew there was a systemic problem of contamination with baby food:

> In 2018, [Consumer Report's] food safety team analyzed 50 nationally distributed packaged foods made for babies and toddlers, checking for cadmium, lead, mercury, and inorganic arsenic, the type most harmful to health.  Those tests found that about two-thirds (68 percent) had worrisome levels of at least one heavy metal. Fifteen of the foods would pose potential health risks to a child regularly eating

just one serving or less per day. Snacks and products containing rice and/or sweet potatoes were particularly likely to have high levels of heavy metals.[66]

        **3.**   *Throughout this time, Defendants continue to falsely reassure consumers that their products are healthy, safe, pure, and natural.*

141.     Despite knowing their products pose a significant risk to the developing minds and bodies of babies and young children, Defendants continue to warrant, promise, represent, mislead, label, and/or advertise that their baby food products are free of any heavy metals and/or unnatural ingredients by making assurances that the foods are natural, pure, healthy, and safe for infant consumption.

   **iii.**   **Beech-Nut**

142.     Beech-Nut advertises its products as being "natural" and including only "simple" ingredients and "nothing artificial." But Beech-Nut omits that ingredients like dehydrated potato, sweet potato, prunes, carrots, spinach, cinnamon, oat flour, and rice flour contain high levels of arsenic, lead, and cadmium—all inorganic heavy metals.[67] Beech-Nut has made similar representations on its product pages since at least July 10, 2017. In fact, on July 10, 2017, Beech-

---

[66] *CR Renews call for FDA and manufacturers to take action*, CONSUMER REPORTS (Feb. 4, 2021), https://advocacy.consumerreports.org/press_release/cr-renews-call-for-fda-and-manufacturers-to-take-action-to-keep-infants-and-children-safe-from-heavy-metals-in-foods/.

[67] *beech-nut natural® banana, cinnamon & granola pouch*, BEECH-NUT, https://www.beechnut.com/product/naturals-banana-cinnamon-granola-pouch/ (last visited Mar. 3, 2021); *beech-nut naturals® sweet potato baked veggie crisps*, BEECH-NUT, https://www.beechnut.com/product/sweet-potato-baked-veggie-crisps/ (last visited Mar. 3, 2021); *beech-nut naturals® carrots jar*, BEECH-NUT, https://www.beechnut.com/product/naturals-just-carrots-jar/ (last visited Mar. 3, 2021); *beech-nut naturals® spinach, zucchini & peas jar*, BEECH-NUT, https://www.beechnut.com/product/naturals-just-spinach-zucchini-peas-jar/ (last visited Mar. 3, 2021).

Nut represented to consumers that its Carrot jars were "just carrots" and "just real vegetables," "nothing artificial."[68]





[68] *beech-nut naturals® carrots jar*, BEECH-NUT, https://www.beechnut.com/product/naturals-just-carrots-jar/; archived from July 10, 2017 at WAYBACK MACHINE, https://web.archive.org/web/20170710011140/http://www.beechnut.com/product/naturals-just-carrots-jar/.





143.     Beech-Nut also knows that its consumers care about "what's inside" their baby food and stresses that the content "matters." It represents to customers that it "conduct[s] over 20 rigorous tests on our purees, testing for up to 255 pesticides and heavy metals (like lead, cadmium and other nasty stuff). Just like you would, we send the produce back if it's not good enough."[69] But Beech-Nut does not tell consumers that it has accepted ingredients that have failed its own

---

[69] *Our Purpose*, Beech-Nut, https://www.beechnut.com/our-story/ (last visited Mar. 3, 2021).

internal standards as well as national guidelines on heavy metal content. Beech-Nut has made these representations on its website since at least July 13, 2019.[70] On a previous version of this page, as early as May 30, 2017, Beech-Nut told consumers that its baby food was "clean food" and "classic, natural and organic real food for babies and toddlers" "with just real, simple ingredients."[71]



144.    Repeatedly, Beech-Nut stresses that it only uses "real," "quality" ingredients.[72] Beech-Nut has made these representations on its website since at least June 14, 2020.[73]

[70] *Our Purpose*, BEECH-NUT, https://www.beechnut.com/our-story/; archived from July 13, 2019 at Wayback Machine, https://web.archive.org/web/20190713000457/https://www.beechnut.com/our-story/.

[71] *Our Purpose*, BEECH-NUT, https://www.beechnut.com/our-story/; archived from July 13, 2019 at Wayback Machine, https://web.archive.org/web/20190713000457/https://www.beechnut.com/our-story/

[72] *Real Ingredients, Gently Cooked™*, BEECH-NUT, https://www.beechnut.com/our-story-naturals/ (last visited Mar. 3, 2021).

[73] *Real Ingredients, Gently Cooked™*, BEECH-NUT, https://www.beechnut.com/our-story-naturals/ (last visited Mar. 3, 2021); archived from June 14, 2020 at Wayback Machine, https://web.archive.org/web/20200614085439/https://www.beechnut.com/our-story-naturals/.







145.    On social media on March 28, 2019, Beech-Nut advertised that its products are for consumers who are "label readers" and look for "natural ingredients only."



146.    Similarly, on March 21, 2018, Beech-Nut represented to consumers that its products contain "nothing else" but the listed ingredient.



iv.    **Campbell (Plum Organics)**

147.    The Plum Organics' mission promises that the company will provide "little ones" with "the very best food from the first bite." This message was relayed to the public over the wires and disseminated further on the internet on February 12, 2018, via social media.





148.    Campbell represents to consumers that its baby foods are "absolutely" "safe to eat" and that "health and safety are always" its "top priorities."[74] Campbell has made these representations on its website since at least August 12, 2020.[75]

> - Is Plum's food safe to eat?
>
> ---
>
> Absolutely! As parents ourselves, health and safety are always our top priorities. If we didn't feel good about our products, we wouldn't serve them to our children or yours.

149.    Campbell understands that parents "want to know everything" that is in their child's foods. Campbell acknowledges this parental desire for transparency and represents to consumers that it performs ingredient testing.[76] Campbell has made these representations on its website since at least August 12, 2020.[77]

> - Why does Plum choose ingredient testing?
>
> ---
>
> We believe ingredient testing allows for better control of the entire product and gets us ahead of any potential issues before it makes its way into a product. It's just like when you make a recipe at home – you want to know everything that's going into the recipe.

150.    Campbell knows that the ingredients in baby food impact child development and these ingredients can be "critical" in healthy eating.

---

[74] *FAQs*, PLUM ORGANICS, https://www.plumorganics.com/faqs/ (last visited Mar. 3, 2021).

[75] https://web.archive.org/web/20200812160036/https://www.plumorganics.com/faqs/.

[76] *FAQs*, PLUM ORGANICS, https://www.plumorganics.com/faqs/ (last visited Mar. 3, 2021).

[77] https://web.archive.org/web/20200812160036/https://www.plumorganics.com/faqs/.



151.    Campbell misleadingly tells consumers that the heavy metals in its products and ingredients meet "applicable government standards." But then Campbell goes on to claim that "there is no federal standard on heavy metals in baby food."[78]

152.    On social media, Campbell represented to customers on June 7, 2019, that the back of the pouch lets customers "find out exactly what [you are] getting!"

---

[78] *FAQs*, PLUM ORGANICS, https://www.plumorganics.com/faqs/ (last visited Mar. 9, 2021).



v.    **Gerber**

153.    Gerber knows that parents want "the very best for [their] little one to ensure she reaches her full potential, and so do we." It represents to parents that it has adopted "super strict" farming practices "to ensure that their fruit and vegetable purees are not only nutritious, but also wholesome and safe for even the littlest bodies." Gerber also misleadingly asserts that its belief "that little ones deserve the highest standards set just for them" guides its mission to "deliver the very best fruits and veggies."[79] Gerber has made these representations on its website since at least November 25, 2020.[80]

---

[79] *Clean Field Farming™: Big Standards for Tiny Tummies,* NESTLE, https://www.gerber.com/big-standards-for-tiny-tummies (last visited Mar. 3, 2021).

[80] *Clean Field Farming™: Big Standards for Tiny Tummies,* Nestle, https://www.gerber.com/big-standards-for-tiny-tummies; archived from Nov. 25, 2020 at



**Clean Field Farming™: Big Standards for Tiny Tummies**

You want the very best for your little one to ensure she reaches her full potential, and so do we. That's why we use super strict Clean Field Farming™ practices to ensure that our fruit & veggie purees are not only nutritious, but also wholesome and safe for even the littlest bodies.

These unique practices guide the way we thoughtfully select our seeds and land, sustainably care for the soil, and trace our harvested crops not only to the farms, but to the very fields where they were grown. That's why we only partner with a select group of farms that meet our strict Clean Field Farming™ practices.

We think little ones deserve the highest standards set just for them. That's why we take our mission to deliver the very best fruits and veggies so seriously.

154.    Gerber also knows that parents do not want high levels of heavy metals in their baby foods, and it represents that its growing standards are the "strictest in the world" to ensure "quality control" because "what you get out is what you put in."[81] Gerber has made these representations on its website since at least November 25, 2020.[82]

---

Wayback Machine, https://web.archive.org/web/20201125013258/https://www.gerber.com/big-standards-for-tiny-tummies.

[81] *Keeping Soil in the Family*, Nestle, https://www.gerber.com/keeping-soil-in-the-family (last visited Mar. 3, 2021).

[82] *Keeping Soil in the Family*, Nestle, https://www.gerber.com/keeping-soil-in-the-family; archived from Nov. 25, 2020 at Wayback Machine, https://web.archive.org/web/20201125021145/https://www.gerber.com/keeping-soil-in-the-family.



155.    On its product pages, Gerber claims that its Clean Field Farming process "ensure[s] our purees are not only nutritious, but also wholesome and safe for every tiny tummy."[83] Gerber has made these representations on its website since at least November 25, 2020.[84]

---

[83] *Carrot*, Nestle, https://www.gerber.com/carrot-0 (last visited Mar. 3, 2021).

[84] *Carrot*, Nestle, https://www.gerber.com/carrot-0; archived from Nov. 25, 2020 at Wayback Machine, https://web.archive.org/web/20201125014630/https://www.gerber.com/carrot-0.



156.    Gerber claims that its rice cereals will help support "learning ability" but they omit that these cereals can contain levels of heavy metals that can cause development issues. And, again, Gerber conveys to consumers that they can rely on its Clean Field Farming practices to ensure that its baby foods are "safe and wholesome."[85] Gerber has made these representations on its website since at least September 30, 2020.[86]

Following Clean Field Farming™ practices, we keep our grains safe and wholesome from farm to kitchen.

---

[85] *Rice*, NESTLE, https://www.gerber.com/gerber-organic-single-grain-cereal-rice (last visited Mar. 3, 2021).

[86] *Rice*, Nestle, https://www.gerber.com/gerber-organic-single-grain-cereal-rice; archived from Sept. 30, 2020 at Wayback Machine, https://web.archive.org/web/20200930035221/https://www.gerber.com/gerber-organic-single-grain-cereal-rice.



157.     On social media, Gerber stressed to consumers on October 12, 2020, that its Clean

Field Farming Standards allows it to "ensure that [our produce is] safe and wholesome for baby."



### vi.    **Nurture**

158.    Nurture and its Happy Family Organics brand promise customers that they can have "peace of mind" because it "source[s] high-quality organic ingredients" and has "rigorous and uncompromising quality standards" so consumers "can feel confident" in what they are feeding their family.[87] Nurture has made these representations on its website since at least August 13, 2020.[88]

---

[87] *Our Commitment to Organic,* NURTURE, https://www.happyfamilyorganics.com/our-mission/going-beyond-organic-standards/ (last visited Mar. 3, 2021).

[88] *Our Commitment to Organic,* Nurture, https://www.happyfamilyorganics.com/our-mission/going-beyond-organic-standards/; archived from Aug. 13, 2020 at Wayback Machine, https://web.archive.org/web/20200813062006/https://www.happyfamilyorganics.com/our-mission/going-beyond-organic-standards/.

### Our Happy Promise

We work with trusted farmers and suppliers, source high-quality organic ingredients, and implement our rigorous and uncompromising quality standards so you can feel confident in what you're feeding your family. Our promise is to bring you peace of mind - so our products meet the following criteria:



Always certified USDA organic



Non-GMO



Grown without the use of toxic persistent pesticides



Packaging made without BPA, BPS, or phthalates

159.    Nurture emphasizes that it goes beyond USDA organic standards because it knows that what children eat in the first few years of life is "crucial." Nurture assures parents that it holds itself to "strict standards" to help children "grow healthy and strong" through "test[ing] and thoroughly analyz[ing] every batch of food."[89] Nurture has made these representations on its website since at least August 13, 2020.[90]

160.    On social media, Nurture assured consumers on July 2, 2019, that it holds its "ingredients to the highest standards, because your baby deserves the best."

---

[89] *Our Commitment to Organic,* NURTURE, https://www.happyfamilyorganics.com/our-mission/going-beyond-organic-standards/ (last visited Mar. 3, 2021).

[90] *Our Commitment to Organic,* Nurture, https://www.happyfamilyorganics.com/our-mission/going-beyond-organic-standards/; archived from Aug. 13, 2020 at Wayback Machine, https://web.archive.org/web/20200813062006/https://www.happyfamilyorganics.com/our-mission/going-beyond-organic-standards/.



161.    Nurture also asserts that parents can "trust" its organic food because Nurture "partner[s] with pediatricians, dietitians, and children's health experts."[91] Nurture has made these representations on its website since at least August 13, 2020.[92]

---

[91] *Our Commitment to Organic,* NURTURE, https://www.happyfamilyorganics.com/our-mission/going-beyond-organic-standards/ (last visited Mar. 3, 2021).

[92] https://web.archive.org/web/20200813062006/https://www.happyfamilyorganics.com/our-mission/going-beyond-organic-standards/.



162.    On August 16, 2019, Nurture made similar promises about its health partners and the fact that parents can trust its organic food on its social media sites.



163.    Nurture claims that its Happy Baby puffs are a "superfood" made by "a team of real parents, pediatricians, and nutritionists" to ensure "health and happiness to our little ones."[93] But they omit that these superfoods also include dangerously high levels of arsenic, lead, and cadmium that have even failed lenient internal standards.[94]

 

164.    On social media, Nurture claimed on July 17, 2019, that these puffs "support brain health" but did not mention the levels of arsenic, lead, and cadmium that can cause developmental issues.

---

[93] https://www.happyfamilyorganics.com/shop/baby/apple-broccoli-finger-food/

[94] House Staff Report at 2-4, 13-15, 22-23, 31-37.



165.    Similarly, Nurture claims that its teethers are "the perfect first snack" but it omits

that teethers have been sold with levels of lead higher than even lenient internal standards.[95]

---

[95] *Blueberry & Purple Carrot Teether*, NURTURE,
https://www.happyfamilyorganics.com/shop/baby/blueberry-purple-carrot-teething-wafer/ (last
visited Mar. 11, 2021).



About our Teethers

The perfect first snack for baby's developing gums, our easily dissolving, organic teething wafers soothe and delight. They're made with jasmine rice flour, a touch of organic fruits and vegetables, and contain no artificial flavors for truly happy smiles.

166.    On social media on November 25, 2019, Nurture asserted that parents can skip the chemicals by purchasing its organic foods. But it did not mention that inorganic heavy metals are still present in its baby foods.



### vii.    The Hain Celestial Group

167.    In promoting its Earth's Best Organic baby food products, Hain tells parents that its products are "time-trusted and safe" and "made from pure ingredients to help children grow up strong and healthy." Hain knows that parents cared about whether "potentially harmful" contaminants were in their products because it noted that its food is "produced without the use of potentially harmful pesticides" but Hain omits that the products *do* contain other "potentially harmful" contaminants, namely toxic heavy metals.[96] Hain has made these representations on its website since at least May 16, 2016.[97]

---

[96] *Brands Available in the US*, HAIN CELESTIAL, http://www.hain.com/brandcats/baby-food/#c1 (click "Baby Food" from the dropdown menu; the click "Earth's Best Organic") (last visited Mar. 3, 2021).

[97] *Brands Available in the US*, Hain Celestial, http://www.hain.com/brandcats/baby-food/#c1 (click "Baby Food" from the dropdown menu; the click "Earth's Best Organic"); archived from May 22, 2016 at WAYBACK MACHINE,



168.    Hain also represents to consumers that from day one, it has "recognized the importance of wholesome, pure nourishment for babies" so its products are "created with care, using pure, simple ingredients found in nature." Because of this "principle," Hain tells parents that they "can trust Earth's Best® products to be safe for your baby and safe for the environment."[98] Hain has made these representations on its website since at least June 1, 2019.[99]

---

https://web.archive.org/web/20160522102854/http://www.hain.com/brandcats/baby-food/#c1 (last visited Mar. 11, 2021).

[98] *Our History*, THE HAIN CELESTIAL GROUP, https://www.earthsbest.com/why-earths-best/our-history/ (last visited Mar. 3, 2021).

[99] *Our History*, THE HAIN CELESTIAL GROUP, https://www.earthsbest.com/why-earths-best/our-history/; archived from June 1, 2019 at WAYBACK MACHINE https://web.archive.org/web/20190719084543/https://www.earthsbest.com/why-earths-best/our-history/ (last visited Mar. 11, 2021).





169.    In discussing its organic ingredients, Hain claims that it has a "rigorous quality assurance process" which allows it to provide "better-for-baby products that are pure, safe and sustainable."[100] Hain has made these representations on its website since at least July 18, 2019.[101]

---

[100] *Our Promise*, THE HAIN CELESTIAL GROUP, https://www.earthsbest.com/why-earths-best/our-promise/ (last visited Mar. 3, 2021)

[101] *Our Promise*, THE HAIN CELESTIAL GROUP, https://www.earthsbest.com/why-earths-best/our-promise/; archived from July 18, 2019 at Wayback Machine.

170.    Hain repeatedly uses this "rigorous product testing" as a "guarantee" to parents of the "quality and safety" of its products.[102] Hain has made these representations on its website since at least July 18, 2019.[103]



The Earth's Best Organic® Difference

- Organic ingredients grown without potentially harmful pesticides
- Unsweetened, unsalted, and no added modified starches
- Kosher certified products (excluding meat varieties)

- No genetically modified ingredients
- No artificial flavors, colors, or preservatives
- Rigorous product testing to guarantee quality and safety

171.    At the heart of its representations to parents about its products is Hain's "Promise" to produce "pure, quality products you can trust."[104] Hain has made these representations on its website since at least July 18, 2019.[105]

---

[102] *Our Promise*, THE HAIN CELESTIAL GROUP, https://www.earthsbest.com/why-earths-best/our-promise/ (last visited Mar. 3, 2021).

[103] *Our Promise*, THE HAIN CELESTIAL GROUP, https://www.earthsbest.com/why-earths-best/our-promise/; archived from July 18, 2019 at Wayback Machine.

[104] *Our Promise*, THE HAIN CELESTIAL GROUP, https://www.earthsbest.com/why-earths-best/our-promise/ (last visited Mar. 3, 2021).

[105] *Our Promise*, THE HAIN CELESTIAL GROUP, https://www.earthsbest.com/why-earths-best/our-promise/; archived from July 18, 2019 at Wayback Machine.



**E. Despite Defendants' knowledge of risks and representations to consumers, the recent Congressional Report demonstrates through internal documentation that nothing has changed, and Defendants continue to put children at risk and engage in food fraud.**

172. Despite the findings made by Clean Label Project, Consumer Report, and Healthy Babies Bright Futures, Defendants refused to cease their perilous practice of producing baby foods full of dangerous toxins and continued to expose millions of babies to these harmful, dangerous ingredients.

173. Following years of dissemination of misinformation by Defendants and their front group about what was contained in baby foods, the U.S. House of Representatives Subcommittee on Economic and Consumer Policy finally intervened and conducted their own investigation into what America's babies were ingesting. The results were shocking.

174. The Report by the U.S. House of Representatives recently confirmed that Defendants continue to sell, distribute, and market baby foods contaminated with dangerous levels of toxic heavy metals. The House Staff Report demonstrated that Defendants were knowingly, recklessly, and/or negligently selling baby foods containing arsenic, mercury, cadmium, lead, and high levels of other toxic heavy metals.

175.    At the onset of their investigation, the Subcommittee reached out to the offending manufacturers, requesting information about their processes and what they knew about the containments in their products fed to babies.

176.    Defendants responded, each making detailed, specific representations to Congress that have since been disputed.[106] Four of the five Defendants (Beech-Nut, Gerber, Hain, and Nurture) cooperated and provided the Subcommittee with testing results.

177.    The Congressional Report concluded that for the four cooperating Defendants:

   a.   All sold baby food with dangerously high levels of lead,[107]

   b.   All sold baby food with dangerously high levels of arsenic,[108]

   c.   All sold baby food with dangerously high levels of cadmium,[109]

   d.   All four of the Defendants that cooperated with Congress not only set their internal standards for heavy metals in ingredients and final products at dangerously high levels, but then sold products that exceeded those already too-lenient internal levels,[110]

   e.   Three of the four Defendants that cooperated with Congress did not even test for mercury,[111]

---

[106] *See* Exhibits D-H attached hereto.

[107] The House Staff Report at 3.

[108] *Id.*

[109] *Id.*

[110] *Id.* at 33-42.

[111] *Id.* at 4.

f.  Three of the four Defendants that cooperated with Congress only tested ingredients, but not the final product, for lead.[112]

### 1. *Arsenic findings*

178.  While there has been no determination of a safe level of arsenic contamination in most baby foods, government agencies have set maximum contaminant levels for inorganic arsenic between 10 ppb and 100 ppb for other exposure paths. Consumer groups that have investigated levels for baby food exposure suggest either a non-detect level or 3 ppb for inorganic arsenic.

179.  With respect to the arsenic contamination, the Subcommittee found that Defendant Beech-Nut:

a.  Used ingredients that tested as high as 913.4 ppb arsenic;[113]

b.  "Routinely used" high-arsenic additives testing over 300 ppb;[114]

c.  Only tested arsenic content in its ingredients, not its final product.[115]

180.  With respect to the arsenic contamination, the Subcommittee found that Defendant Gerber routinely included flour with over 90 ppb inorganic arsenic and juice concentrate with high arsenic levels in its baby food products.[116]

181.  With respect to the arsenic contamination, the Subcommittee found that Defendant Hain (manufacturer of Earth's Organics) sold finished baby food products testing as high 129 ppb of inorganic arsenic.[117]

---

[112] *Id.* at 22.

[113] *Id.* at 3.

[114] *Id.*

[115] *Id.* at 17.

[116] *Id.* at 19, 52.

[117] *Id.* at 54.

182.    The Subcommittee also found that Defendant Hain had used vitamin pre-mix and two rice flours that had surpassed its internal toxic heavy metal limits. Internally, Defendant Hain had set a 100ppb limit for its ingredients, but the vitamin pre-mix had 223 ppb and the rice flour lots had 309 ppb and 134 ppb.[118]

183.    Despite having dangerously high levels of toxic heavy metals, Defendant Hain approved the use of this vitamin pre-mix based on a "theoretical" calculation of toxic heavy metals in the final good of 85ppb of arsenic and 25ppb of lead.[119] But the Subcommittee could not tell that Defendant Hain had ever confirmed the ***actual*** levels in the final product. This is especially troubling because the Subcommittee found that Defendant Hain had previously told the FDA in a secret presentation that the vitamin pre-mix had caused dangerous levels of arsenic in its finished product.

184.    The Subcommittee obtained the secret presentation Defendant Hain made on August 1, 2019, which revealed their corporate policies to test only ingredients, not final products, which underrepresents the levels of toxic heavy metals in its baby foods.[120] Hain presented the FDA with a PowerPoint presentation, noting higher levels of arsenic in all finished foods tested for the presentation than were reflected in tests of individual raw ingredients.[121] The Subcommittee noted, "This revelation means that every single finished good containing brown rice had more arsenic than the company's estimates, which were based on testing the raw ingredients."[122]

---

[118] *Id.* at 41.

[119] *Id.*

[120] *Id.* at 5, 53-56.

[121] *FDA Testing Result Investigation*, HAIN CELESTIAL (Aug. 1, 2019) (Attached as Exhibit I).

[122] House Staff Report at 53.

185.     With respect to the arsenic contamination, the Subcommittee found that Defendant Nurture (manufacturer of Happy Baby foods) sold finished baby food products that tested as high as 180 ppb for inorganic arsenic.[123]

### 2. Lead findings

186.     While there has been no determination of a safe level of lead contamination in baby foods, government agencies have set maximum contaminant levels for lead between 10 ppb and 100 ppb for other exposure paths. Consumer, environmental, and medical groups that have investigated levels for baby food exposure have suggested either non-detect or 1 ppb for lead.

187.     With respect to the lead contamination, the House Staff Report found that Defendant Beech-Nut:

    a.   Used ingredients as high as 886.9 ppb lead;[124]

    b.   Only tested lead content in its ingredients, not its final product.[125]

188.     With respect to the lead contamination, the House Staff Report found that Defendant Gerber used ingredients testing as high as 48 ppb lead.[126]

189.     The Subcommittee also found that Defendant Hain had used vitamin pre-mix that had surpassed its internal lead limits of 100 ppb. The vitamin pre-mix accepted and used had 352 ppb of lead.[127] Despite having dangerously high levels of toxic heavy metals, Defendant Hain approved the use of this vitamin pre-mix based on a "theoretical" calculation of toxic heavy metals

---

[123] *Id.* at 13.

[124] *Id.* at 3.

[125] *Id.* at 22.

[126] *Id.* at 27.

[127] *Id.* at 41.

in the final good of 85 ppb of arsenic and 25 ppb of lead.[128] But the Subcommittee could not tell that Defendant Hain had ever confirmed the *actual* levels in the final product.

190.    With respect to the lead contamination, the Subcommittee found that Defendant Nurture (manufacturer of Happy Baby foods) sold finished baby food products that tested as high as 641 ppb for lead—over six times higher than its internal limit of 100 ppb lead.[129] Almost 20 percent of the baby food products that Defendant Nurture tested contained over 10 ppb lead.[130]

### 3.  Cadmium findings

191.    While there has been no determination of a safe level of cadmium contamination in baby foods, government agencies have set maximum contaminant levels for cadmium between 5 ppb and 20 ppb for other exposure paths. Consumer groups that have investigated levels for baby food exposure have suggested either non-detect or 1 ppb for cadmium.

192.    With respect to the cadmium contamination, the Subcommittee found that Defendant Beech-Nut:

    a.   Used 105 ingredients testing over 20 ppb cadmium, some testing as high as 344.55 ppb;[131]

    b.   Sold eleven products that surpassed its own internal (already-too-high) cadmium limits.[132]

---

[128] *Id.*

[129] *Id.* at 22.

[130] *Id.* at 3.

[131] *Id.*

[132] *Id.* at 38-39.

193.    With respect to the cadmium contamination, the Subcommittee found that Defendant Gerber does not test all its ingredients for cadmium. Of those it does test, it accepted ingredients with as much as 87 ppb of cadmium.[133]

194.    With respect to the cadmium contamination, the Subcommittee found that Defendant Hain had used 102 ingredients in its baby food that tested over 20 ppb cadmium, with some testing up to 260 ppb (much higher than its internal 100 ppb cadmium limit).[134]

195.    With respect to the cadmium contamination, the Subcommittee found that almost 65 percent of Defendant Nurture's finished baby food contained over 5 ppb of cadmium.

### 4.   Mercury findings

196.    While there has been no determination of a safe level of mercury contamination in baby foods, government agencies have set maximum contaminant levels for mercury at 2 ppb for other exposure paths. Consumer groups that have investigated levels for baby food exposure have suggested non-detect threshold for mercury.

197.    With respect to the mercury contamination, the Subcommittee found that Defendants Beech-Nut and Hain do not even test for mercury in their ingredients or finished baby food.[135] Defendant Gerber only presented the Subcommittee with mercury testing results for three ingredients.

198.    With respect to the mercury contamination, the Subcommittee found that Defendant Nurture (manufacturer of Happy Baby foods) sold finished baby food products that contained as much as 10 ppb of mercury.[136]

---

[133] *Id.* at 32.

[134] *Id.* at 3, 41.

[135] *Id.* at 4, 33.

[136] *Id.* at 4.

### 5. *Uncooperative Defendant hides its contamination.*

199.   Defendant Campbell refused to cooperate with the Subcommittee.[137] The House Staff Report concludes: "The Subcommittee is greatly concerned that their lack of cooperation might be obscuring the presence of even higher levels of toxic heavy metals in their baby food products than their competitors' products."[138]

200.   The Subcommittee noted that Defendant Campbell refused to produce its testing standards and specific testing results. The Subcommittee concluded that Defendant Campbell (manufacturer of Plum Organics) "has hidden its policies and the actual level of toxic heavy metals in its products."[139] The Subcommittee further noted its great concern that Defendant Campbell's "lack of cooperation might obscure the presence of even higher levels of toxic heavy metals in their baby food products, compared to their competitors' products."[140]

201.   Based on a letter from Defendant Campbell to the Subcommittee, they do not routinely test all products or ingredients for the presence of heavy metals. Rather, they conducted *ad hoc* testing (most recently in September 2019) when they "reexamined" only the Plum Organics foods featured in the Healthy Babies Bright Futures report.[141] Currently, Defendant Campbell only does testing on new ingredients or finished product testing on new products.[142] As such, it does no routine testing of all ingredients or products.

---

[137] *Id.* at 2.

[138] *Id.* at 5.

[139] *Id.* at 44.

[140] *Id.* at 5.

[141] Letter from attorney Thomas Perrelli on behalf of Campbell to Chairman Raja Krishnamoorthi, Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform (Dec. 11, 2019) (emphasis added). Attached as Exhibit H.

[142] *Id.*

### 6.   Beyond specific testing results, the Subcommittee noted serious shortcomings in Defendants' overall manufacturing, testing, and sale of the products.

202.   As reported by Congress, Defendants Beech-Nut, Gerber, Hain, and Nurture knew these heavy metals posed a threat and set their own internal standards for how much of these toxins were present in their product. However, these Defendants then proceeded to continue to turn a blind eye to their dangers by selling food that contained heavy metals that far exceeded these levels.

203.   Based on a review of internal documents from Defendants, the Subcommittee concluded that corporate policies to test only ingredients, not final products, underrepresents the levels of toxic heavy metals in baby foods.

204.   For example, Defendant Hain tested a limited number of finished baby food products for inorganic arsenic. In 100 percent of the products tested, the inorganic arsenic levels were 28 percent to 93 percent higher than their estimates based on individual ingredient testing.[143]

205.   The Subcommittee went on to note that "only testing ingredients gives the false appearance of lower-than-actual toxic heavy metal levels." For this reason, "ingredient testing is inadequate, and . . . only final product testing can measure the true danger posed by baby foods."[144] The Subcommittee concluded that a policy of testing only ingredients "recklessly endangers babies and children and prevents the companies from even knowing the full extent of the danger presented by their products."

206.   The Congressional Report also documented that the companies that did test final products routinely sold products that had exceeded internal company guidelines that these companies assured consumers were being met.

---

[143] *Id.* at 5.

[144] *Id.* at 6.

207.   For example, Defendant Hain had an internal 100 ppb spec limit on inorganic arsenic. While Defendant Hain did not routinely test finished products, when it did, it found finished goods that contained as much as 129 ppb inorganic arsenic.

208.   As another example, Defendant Nurture set internal thresholds for toxic heavy metals at 100 ppb for inorganic arsenic, 100 ppb for lead, 50 ppb for cadmium, and 10 ppb for mercury. But Defendant Nurture (manufacturer of Happy Baby products) sold all the finished products it tested "regardless of how much toxic heavy metal the baby food contained."[145] Those products sold included baby food that contained as much as 180 ppb of inorganic arsenic, 641 ppb of lead, and 10 ppb of mercury. More than 25 percent of the food Defendant Hain sold had over its internal limit of 100 ppb inorganic arsenic.

209.   Defendant Nurture also produced inaccurate data during the investigation in what the Subcommittee concluded was an attempt to mislead it:

> Further, **Nurture appears to have misled the Subcommittee about its testing standards.** As seen from Nurture's goal thresholds pictured below, Nurture conveyed to the Subcommittee that after January of 2019, it had a goal threshold of 50 ppb for lead in all of its baby food products—infant formula, cereals, and wet foods. However, in the test results that Nurture provided to this Subcommittee, it was still using 100 ppb as an internal guideline after January 2019.[146]

---

[145] *Id.* at 4.

[146] *Id.* at 35 (emphasis added).

This image is from Nurture's December 18, 2019, response to the Subcommittee, stating that after January of 2019, its lead threshold was 50 ppb in all baby food products:[91]

All of our specific goal thresholds for the referenced contaminants[8] are set forth in the chart below.

| Product Type | Contaminant | Analytical Matrix | Goal Threshold | Unit |
|---|---|---|---|---|
| Infant Formula | Cadmium | As Sold | 10 | ppb |
| Infant Formula | Inorganic Arsenic | As Sold | 75 | ppb |
| Infant Formula | Lead | As Sold | 50 | ppb |
| Cereals | Cadmium | As Consumed | 50 | ppb |
| Cereals with <75% Rice | Inorganic Arsenic | As Sold | 100 | ppb |
| Cereals with >75% Rice | Inorganic Arsenic | As Sold | 115 | ppb |
| Cereals | Lead | As Consumed | 50* | ppb |
| Cereals | Mercury | As Consumed | 10 | ppb |
| Wet Foods | Cadmium | As Consumed | 50 | ppb |
| Wet Foods | Inorganic Arsenic | As Sold | 100 | ppb |
| Wet Foods | Lead | As Consumed | 50* | ppb |
| Wet Foods | Mercury | As Consumed | 10 | ppb |

*Threshold lowered from 100ppb to 50ppb in January, 2019.

However, the chart below appears to show that after the date Nurture claims to have moved to a 50 ppb lead standard—January 2019—Nurture was still using a "Goal Threshold" of 100 ppb for 53 baby food products. The fact that Nurture appears to have continued using a higher standard up to nine months after it claimed to the Subcommittee to have lowered the threshold casts serious doubt on Nurture's candor in this matter.

210.    The House Staff Report—coupled with the lack of cooperation from some Defendants—revealed that babies across the United States and beyond consume food that contains high levels of toxins and heavy metals. Further, the House Staff Report demonstrated that Defendants knowingly sold these products to unsuspecting families, displaying little regard for the health and wellbeing of the innocent children.[147]

211.    Defendants knowingly manufactured baby foods with high levels of heavy metals, even though they were aware of the danger posed by these toxic ingredients. Defendants displayed

---

[147] *See* The House Staff Report.

a reckless disregard or complete indifference to the probable consequences of the actions to the babies and children who ingested their products.

212.    Defendants were clearly aware that Plaintiffs, members of the putative class, and consumers repeatedly purchased products that did not conform to the standard Defendants advertised these products as satisfying. The fact that these food products contained potential toxins and could lead to cognitive and health problems for infants constituted wantonness on the behalf of Defendants.

F. **After the Congressional Report, Defendants again presented the public with misleading half-truths to avoid having to eliminate harmful contamination and avoid further regulation.**

213.    When confronted by the U.S. House of Representatives regarding the heavy doses of these toxins in these baby foods, Defendants boasted that their products were conforming with regulations. But Defendants were well aware that there were no such regulatory standards because the FDA had not determined that any level of lead, cadmium, or mercury were safe in baby foods and snacks. And while FDA has set an inorganic arsenic standard of 100 ppb for infant cereal, most Defendants do not test their final products to determine compliance and Defendant Nurture sets a higher internal threshold (115 ppb) for final goods for sale than what was allowed by the FDA.[148]

214.    The Congressional Report also documented that Defendants that did test final products routinely sold products that had exceeded internal company guidelines that these companies assured consumers were being met.

215.    When originally confronted with the inquiry about these products containing high levels of heavy metal, Defendant Beech-Nut represented to the Subcommittee in a December 6,

---

[148] *Id.* at 37.

2019, letter that it applied "rigorous testing protocols and heavy metal testing standards which are continuously reviewed and strengthened."[149] Defendant Beech-Nut did concede that it used products over its own internal limits—"generally" up to 20% over those limits.[150]

216.    Since the release of the Congressional Report, Defendant Beech-Nut has continued to misleadingly assure parents and consumers that its products are "safe and nutritious" in a message provided to the press and carried over the wires on February 5, 2021.[151]

217.    Since its initial response, Defendant Beech-Nut voluntarily recalled its infant rice cereal in June 2021 because the product exceeds a US Food and Drug Administration limit of 100 parts per billion of arsenic. Defendant Beech-Nut acknowledged that its ingredient testing had shown lower levels but that sample testing of the finished product had confirmed levels above the FDA guidance level.[152]

218.    In June 2021, Defendant Beech-Nut simultaneously reported that it would "exit the market for Beech-Nut branded Single Grain Rice Cereal." Defendant Beech-Nut was "concerned about the ability to consistently obtain rice flour well-below the FDA guidance level and Beech-Nut specifications for naturally occurring inorganic arsenic."

---

[149] Letter from the President and CEO of Beech-Nut Nutrition Company to Chairman Raja Krishnamoorthi, Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform (Dec. 6, 2019) https://oversight.house.gov/sites/democrats.oversight.house.gov/files/6_0.pdf). Attached as Exhibit E.

[150] *Id.*

[151] Elaine Watson, *Baby food brands defend protocols as congressional report alleges 'highly dangerous' levels of heavy metals in infant foods; expect lawsuits, stays attorney,* Food Navigator (Feb. 5, 2021), https://www.foodnavigator-usa.com/Article/2021/02/05/Baby-food-brands-defend-protocols-as-congressional-report-alleges-highly-dangerous-levels-of-heavy-metals.

[152] https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/beech-nut-nutrition-company-issues-voluntary-recall-one-lot-beech-nut-single-grain-rice-cereal-and#recall-announcement

219.    As of August 2021, no other Defendant has exited the single grain rice cereal market.

220.    Defendant Campbell misleadingly told the Congressional Subcommittee by letter dated December 11, 2019: "Campbell has conducted testing on every Plum Organics product on the market to ensure **none exceed acceptable levels of arsenic, lead, cadmium, or mercury** . . . . To date, no Plum Organics foods have been found to be above exposure limits set by available domestic and international regulatory bodies . . . ."[153]

221.    Defendant Campbell continues to obfuscate the truth from the public. Notably, after the release of the Congressional Report, it stated to the press in a message carried over the wires on February 5, 2021: "Campbell has conducted testing on every Plum Organics product on the market to ensure none exceed acceptable levels of arsenic, lead, cadmium, or mercury."[154] However, Defendant Campbell never clarified what "acceptable levels" are or provided any substantive information about heavy metals in their food.

222.    In a letter dated December 19, 2019, Defendant Gerber similarly stated that it "takes all concerns related to safety very seriously, which is why all of our foods and beverages meet our safety and quality standards and conform to all regulatory compliance guidelines."[155]

---

[153] Letter from attorney Thomas Perrelli on behalf of Campbell to Chairman Raja Krishnamoorthi, Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform (Dec. 11, 2019) (emphasis added). Attached as Exhibit H.

[154] Elaine Watson, *Baby food brands defend protocols as congressional report alleges 'highly dangerous' levels of heavy metals in infant foods; expect lawsuits, stays attorney,* FOOD NAVIGATOR (Feb. 5, 2021), https://www.foodnavigator-usa.com/Article/2021/02/05/Baby-food-brands-defend-protocols-as-congressional-report-alleges-highly-dangerous-levels-of-heavy-metals.

[155] Letter from Geber CEO William Partyka to Chairman Raja Krishnamoorthi, Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform (Dec. 19, 2019). Attached as Exhibit G.

223.     Similarly, after the release of the Congressional Report, Defendant Gerber stated to the press in a message carried over the wires on February 5, 2021, that its standards "are among the strictest in not just the US, but the world . . . [. W]here government standards don't currently exist, we develop our own rigorous standards."[156]

224.     Defendant Gerber stated to the press in a message carried over the wires on February 5, 2021, that its products were safe by misleadingly pointing to the FDA and the Baby Food Council: "We want to **reassure** parents Beech-Nut products **are safe** and nutritious . . . . We look forward to continuing to work with the FDA, in partnership **with the Baby Food Council** . . . ."[157]

225.     On February 4, 2021, Defendant Hain issued a press release over the wires stating: "Our rigorous internal standards and testing procedures ensure **Earth's Best products meet or exceed the current federal guidelines**."[158] Defendant Hain further claimed: "Nothing is more important to Earth's Best than the trust and confidence of parents that our organic products provide safe nutrition for healthy babies."[159] But in reality, Defendant Hain does not regularly test its finished baby products to see what levels of arsenic, lead, cadmium, or mercury they contain. And

---

[156] Sandee LaMotte, *Leading baby food manufactures knowingly sold products with high levels of toxic metals, a congressional investigation found*, CNN (Feb. 5, 2021) http://lite.cnn.com/en/article/h_70f72c54f916c524cf6b759a5d57c2cc.

[157] Elaine Watson, *Baby food brands defend protocols as congressional report alleges 'highly dangerous' levels of heavy metals in infant foods; expect lawsuits, stays attorney*, FOOD NAVIGATOR (Feb. 5, 2021), https://www.foodnavigator-usa.com/Article/2021/02/05/Baby-food-brands-defend-protocols-as-congressional-report-alleges-highly-dangerous-levels-of-heavy-metals (emphasis added).

[158] *February 4, 2021 Press Release*, HAIL CELESTIAL (Feb. 4, 2021) https://ir.hain.com/news-releases/news-release-details/statement-behalf-earths-best-organic-response-congressional (emphasis added).

[159] *February 4, 2021 Press Release*, HAIL CELESTIAL (Feb. 4, 2021) https://ir.hain.com/news-releases/news-release-details/statement-behalf-earths-best-organic-response-congressional (emphasis added).

when Defendant Hain did test a small sample of finished product, it found that its products exceeded the FDA inorganic arsenic guidelines.[160] Defendant Hain also continued to use ingredients that exceeded internal standards. Defendant Hain continued to use these ingredients even after it admitted to the FDA that its previous use of a vitamin premix with high levels of inorganic arsenic had caused its finished products to also have dangerous levels of inorganic arsenic.[161]

226.    In February 2021, after the release of the Congressional Report, Defendant Nurture doubled down about the safety and health of its products by misleadingly referencing non-existent FDA standards: "We can say with the **utmost confidence** that **all** Happy Family Organics products are safe for babies and toddlers to enjoy and we are proud to have **best-in-class testing protocols** in our industry. We only sell products that have been rigorously tested and **we do not have products in-market with contaminant ranges outside of the limits set by the FDA**."[162]

227.    As these specific misrepresentations by each Defendant show, each was more interested in protecting profits than making meaningful changes to eliminate toxic heavy metal contamination. Once Congress illustrated Defendants' continued manufacturing, testing, and distribution practices that led to contaminated baby food, Defendants engaged in a whole new round of fraud to conceal and prolong their schemes to defraud.

---

[160] House Staff Report, at 15-16.

[161] House Staff Report, at 41-43.

[162] *Quality and Safety of Our Products*, NURTURE, https://www.happyfamilyorganics.com/quality-and-safety-of-our-products/ (last visited Mar. 3, 2021) (emphasis added). The first capture on the Wayback Internet Archive is on February 5, 2021. https://web.archive.org/web/20210205034954/https://www.happyfamilyorganics.com/quality-and-safety-of-our-products/

228.    Defendants' actions and inactions have likely caused irreparable harm to hundreds of thousands of families across the nation.

229.    Plaintiffs and members of the putative class have also suffered significant economic damages, to the tune of billions of dollars,[163] because they paid for what was represented as healthy, nutritious baby food for their children, devoid of contaminants, but received foods containing harmful levels of heavy metals.

### G. Equitable Tolling, Discovery Rule, and Fraudulent Concealment

230.    Plaintiffs repeat and re-allege the allegations set forth above. At all times relevant to this Complaint, Defendants took active steps to conceal their unlawful activities.

231.    **Discovery Rule:** Plaintiffs and the members of the Class had no knowledge or reason to know of Defendants' knowing concealment of toxic heavy metals in their products until on or about (at the earliest) February 4, 2021, when the U.S. House of Representatives Committee on Oversight and Reform released its explosive report, "*Baby Foods Are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury.*"

232.    Plaintiffs and the Class are consumers who do not have the training or means by which they could have discovered Defendants' knowing concealment of toxic heavy metals in their products until on or about (at the earliest) February 4, 2021, if then.

233.    Information regarding the unlawful conduct described herein was not available to Plaintiffs and members of the Class prior to Defendants' knowing concealment of toxic heavy metals in their products until on or about (at the earliest) February 4, 2021. Plaintiffs and members

---

[163] Emma Bedford, *U.S. baby food market - statistics & facts*, STATISTA (Nov. 20, 2020), https://www.statista.com/topics/1218/baby-food-market/.

of the Class had no previous, reasonable means of obtaining the facts or information concerning the Defendants' unlawful activities, all of which were purposefully concealed by Defendants.

234.    For these reasons, the statute of limitations as to Plaintiffs' and the Class's claims did not begin to run and has been tolled with respect to the claims that Plaintiff and the members of the Class have alleged in this Complaint.

235.    **Fraudulent Concealment and/or Equitable Tolling:** In the alternative, application of the doctrine of fraudulent concealment and/or equitable tolling tolled the statute of limitations on the claims asserted herein by Plaintiffs and the Class. Plaintiffs and the members of the Class did not discover, and could not have reasonably discovered, Defendants' knowing concealment of toxic heavy metals in their products alleged herein until on or about (at the earliest) February 4, 2021, when the U.S. House of Representatives Committee on Oversight and Reform released its explosive report, "*Baby Foods Are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury.*"

236.    Before that time, Plaintiffs and the members of the Class were unaware of Defendants' unlawful conduct and did not know before then about Defendants' knowing concealment of toxic heavy metals in their products. Defendants provided no information, actual or constructive, to Plaintiffs and members of the Class.

237.    The affirmative acts of Defendants alleged herein were wrongfully concealed and carried out in a manner that precluded detection.

238.    Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate Defendants' knowing concealment of toxic heavy metals in their products before February 4, 2021.

239.    Plaintiffs and the members of the Class could not have discovered the alleged unlawful activity at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants to avoid detection of, and fraudulently conceal, their unlawful conduct.

240.    Because the alleged unlawful conduct alleged herein was self-concealing and affirmatively concealed by Defendants, Plaintiffs and members of the Class had no knowledge of the alleged unlawful conduct or of any facts or information that would have caused a reasonably diligent person to investigate before February 4, 2021.

241.    For these reasons, the statute of limitations applicable to Plaintiffs' and the Class's claims was tolled and did not begin to run until February 4, 2021.

242.    **Continuing Tort**: Defendants are estopped from relying on any statute of limitations defense because their illegal, deceptive, and fraudulent practices as alleged herein, which are continuing, have created continuing and repeated injuries to Plaintiffs and the Class.

## IV.    CLASS ACTION ALLEGATIONS

243.    Plaintiffs bring this action individually and on behalf of the following Class pursuant to Rules 23(a) and 23(b)(2) and (3) of the Federal Rules of Civil Procedure:

- All persons in the United States who, from January 1, 2019, to the present, purchased foods for babies, toddlers or children manufactured by Defendants Beech-Nut, Campbell, Gerber, Hain, or Nurture, for household or business use, and not for resale.

- Excluded from the Class is the Defendants, any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, co-conspirators, all governmental entities, and any judge, justice, or judicial officer presiding over this matter.

244.    This action is brought and may be properly maintained as a class action. There is a well-defined community of interests in this litigation and the members of the Class are easily

ascertainable. Purchasers of these products can identify their purchases through receipts, store rewards programs, and their own testimony.

245.    The members in the proposed Class are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of all Class members in a single action will provide substantial benefits to the parties and Court.

246.    Questions of law and fact common to Plaintiffs and the Class include, but are not limited to, the following:

    a.  whether Defendants owed a duty of care to Plaintiffs and the Class;

    b.  whether Defendants knew or should have known that the baby foods contained or may contain heavy metals;

    c.  whether Defendants wrongfully represented and/or continue to represent that the baby foods are natural and safe for human infant and child consumption;

    d.  whether Defendants misrepresent their baby foods as healthy, superior quality, nutritious, and safe for consumption;

    e.  whether Defendants wrongfully represented and/or continue to represent that these products are natural;

    f.  whether Defendants wrongfully represented and/or continue to represent that the manufacturing of baby foods is subjected to rigorous standards, including testing for heavy metals and government regulation;

    g.  whether Defendants wrongfully failed to disclose that their baby foods contained, or may contain, heavy metals;

    h.  whether Defendants' representations in advertising, warranties, packaging, and/or labeling are false, deceptive, and/or misleading;

i.   whether those representations are likely to deceive a reasonable consumer;

j.   whether a reasonable consumer would consider the presence or risk of heavy metals as a material fact in deciding to purchase baby food;

k.   whether Defendants had knowledge that their representations were false, deceptive, and misleading;

l.   whether Defendants continue to disseminate those representations despite knowledge that the representations are false, deceptive, and misleading;

m.  whether a reasonable consumer would find it material if a product is represented as healthy, superior quality, nutritious, and safe for consumption and that it does not contain arsenic, mercury, cadmium, lead, and/or other heavy metals;

n.   whether Defendants' representations and descriptions on the labeling of their baby foods are likely to mislead, deceive, confuse, or confound consumers acting reasonably;

o.   whether each Defendant, on its own or as a group, engaged in a pattern of racketeering activity;

p.   whether each Defendant, on its own or as a group, infiltrated the Baby Food Council and used it as a RICO enterprise;

q.   whether the pattern of racketeering committed by Defendant, or the Defendants as a group, were the but for and proximate cause of Plaintiffs' RICO damages;

r.   whether Plaintiffs and the members of the Class are entitled to actual and statutory damages; and

s.   whether Plaintiffs and members of the Class are entitled to declaratory and injunctive relief.

247.    Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of Class members. Identical statutory violations and business practices and harms are involved. Individual questions, if any, are not prevalent in comparison to the numerous common questions that dominate this action.

248.    Plaintiffs' claims are typical of those of the members of the Class in that they are based on the same underlying facts, events, and circumstances relating to Defendants' conduct.

249.    Plaintiffs will fairly and adequately represent and protect the interests of the Class, have no interests incompatible with the interests of the Class, and have retained counsel competent and experienced in class action, consumer protection, and false advertising litigation.

250.    Class treatment is superior to other options for resolution of the controversy because the relief sought for each member of the Class is small such that, absent representative litigation, it would be infeasible for members of the Class to redress the wrongs done to them.

251.     Questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class.

252.    As a result of the foregoing, class treatment is appropriate.

## V.    CLAIM

### COUNT I: VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (CIVIL RICO) UNDER 18 U.S.C. § 1962(c) AND (d)

253.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

254.    At all relevant times, Defendants have been "persons" under 18 U.S.C. § 1961(3).

255.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to

conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

256.    Section 1962(d) makes it unlawful for "any person to conspire to violate," among other provisions, Section 1962(c). *See* 18 U.S.C. § 1962(d).

257.    Each Defendant is a participant in the multi-billion-dollar baby food industry. Finding it difficult to achieve their ambitious goals lawfully and to outsell their competitors by playing by the rules, each Defendant resorted to cheating through a scheme to defraud that included four types of fraud: false representations, fraud by omission, fraudulent concealment, and fraud by half-truth.

258.    Each Defendant knew that American parents and purchasers are closely focused on the ingredients in baby food. They designed marketing and advertising campaigns around food safety and purity. The whole time they did so, Defendants knew their products were not as advertised—the products were contaminated (not pure), included foreign substances (not natural), and were dangerous to highly vulnerable babies and toddlers (not safe).

259.    This RICO claim is for the compensatory damages (on behalf of the purchasers) that resulted from the baby food companies' interstate, nationwide schemes to fraud. It does not seek recovery for personal injuries, nor does it rely upon any personal injuries occurring. Instead, the baby food that was sold was "essentially worthless" because it did not contain the very essence of what was advertised. Parents and purchasers bought this baby food because it was natural, pure, and safe—thus, because it was not, and each Defendant either concealed or omitted facts or spoke in half-truths, the very purpose of these purchases was fraudulently induced.

260.    Worse, Defendants have prolonged their fraud by covering up and actively speaking out to falsely deny their underlying fraud occurred. To this day, they have not recalled

the contaminated products and are using the pretext of the Baby Food Council to avoid taking responsibility for their fraud.

261.    Consumers and purchasers are not highly knowledgeable about food manufacturing or processing and lack any ability to uncover the fraud that is occurring. Defendants aggravated this information asymmetry by using the Baby Food Council to lull purchasers and further obscure their fraud and to falsely suggest they are committed to baby food safety.

### A. The Baby Food Council Is Infiltrated by Each Defendant and Used as An Enterprise for Fraud

262.    At all relevant times, Defendants each engaged in food fraud using the Baby Food Council as an enterprise, or in the alternative, forming an association-in-fact enterprise with the Baby Food Council and/or the other Defendants. At this stage, without access to discovery to see the private communications between Defendants, Plaintiffs plead in the alternative. They will later clarify their allegations once discovery has occurred and they have obtained the emails and other documents needed to explain the precise structure among Defendants.

263.    According to its website, the Baby Food Council, as an entity, has existed since January 2019. Discovery is needed to confirm when it was actually created, who created it, how the Defendants worked together to create it, the financial payments that were made, the finances of the entity, and so forth. These documents and records are not publicly available and are kept confidential by Defendants, the Council, and the members of the Council.

264.    Each Defendant infiltrated and used the Baby Food Council as a vessel for fraud so that each Defendant could sell contaminated baby food products to purchasers without incurring the expense and time required to properly manufacture and process these foods. Alternatively, the Defendants formed and infiltrated the Baby Food Council to use it as a vessel for fraud and worked together to accomplish their schemes to defraud.

265.     Once the American media uncovered the massive food fraud scheme that had been ongoing since January 2019, each Defendant hid behind its membership and status in the Baby Food Council as a decoy and shield, as well as to lull victims of their food fraud into not believing what Congress had publicly exposed.

266.     Defendants falsely suggested and implied that membership in the Baby Food Council membership was a defense to the fraud and that they were committed to baby safety and health and best practices.

267.     Each Defendant also used its membership in the Baby Food Council as a pretext for not adopting standards for baby food manufacturing. Each Defendant did not disclose that it was co-opting the push for FDA standards by promising that baby food manufacturers would regulate themselves and work to adopt food standards. Although they claim the FDA is a member of the Baby Food Council, they took no action with the FDA and steered the FDA away from adopting standards. Thus, the lack of standards by the FDA is part of the scheme to defraud. Each Defendant worked to defeat the adoption of FDA standards using the Baby Food Council as an instrument to do so. This tactic is straight out of the playbook used by Big Tobacco for decades.

268.     Each Defendant's claim of membership was also false and misleading because the Baby Food Council has not done anything to help American babies and to date has been kept dormant. Rather, it has been set up so Defendants can use it to avoid liability. As set forth above, the Council has engaged in no meaningful activity in the 30 months since it was created. The Baby Food Council is a shell entity that has only been used to cover up the food fraud committed by Defendants.

269.     Each Defendant has dragged out the adoption of standards and any manufacturing and processing reform by using the diversion and distraction of the Baby Food Council, despite

willfully knowing that the Baby Food Council would take no action and would serve only as a lifeless scarecrow.

270.     The Baby Food Council has also served as an anchor for Defendants to coordinate, work together, and unify their cover-up and concealment of their food fraud—to work together, aligned through the auspices of the Baby Food Council, as an association-in-fact enterprise. Defendants use the Baby Food Council to coordinate and synchronize their fraudulent marketing and sales strategy and manufacturing processes.

271.     Without the Baby Food Council, each Defendant would be exposed and forced to defend its food fraud on its own. With the Baby Food Council, Defendants are all able to band together, point to each other's shared industry-wide commitment, and defraud and defend consistently as a united group. This, too, confirms the Baby Food Council is an essential part of each Defendant's scheme to defraud Plaintiffs and the Class.

272.     Discovery is needed to uncover the confidential emails and communications among the Defendants showing how they worked together as an association-in-fact enterprise and collectively worked together using the Baby Food Council. They worked together to compete in the marketplace on this issue, rather than against each other as competitors usually do.

273.     In addition to the Defendants forming an association-in-fact enterprise with the Baby Food Council, in the alternative, the Baby Food Council is an enterprise and each Defendant has operated or participated, directly or indirectly, in the affairs of the Baby Food Council through a pattern of racketeering activity—*i.e.*, wire fraud, mail fraud, and the corruption of an official proceeding before Congress.

274.     Indeed, Defendants had no legitimate or lawful use for becoming members of the Baby Food Council other than to use it to commit fraud. They engaged in repeated acts of wire

fraud and mail fraud, and they sought to cover up and explain away this fraud using their membership in the Baby Food Council and statements it made as an alibi for their food fraud. If they had a legitimate interest in protecting babies and infants, they would have either adopted standards and complied with them, not sold defective products, or recalled their defective products and apologized (offering refunds) once the 2021 Congressional Report came down. That they are continuing to use the Baby Food Council as part of their concealment strategy, citing their membership in the hollow Baby Food Council as a way to lull victims and Congress into believing they are not guilty of fraud, further shows the Baby Food Council is integral to the pattern of mail and wire fraud, which remains ongoing.

275.    The Baby Food Council's inactivity and failure to engage in any substantive activity for over 30 months confirms it has been infiltrated by Defendants and used by them as a vessel for fraud.

276.    If the Baby Food Council were a legitimate organization actually committed to baby food health and safety, it would have taken active steps to combat baby food contamination and speak out against the widely-established, industry-wide baby food fraud that was exposed in February 2021. But the Baby Food Council said and did nothing.

277.    It is necessary to hold Defendants accountable for their racketeering so that the Baby Food Council can be cleansed of these bad actors. Freed from Defendants' fraud and nefarious influences, the Baby Food Council can actually take steps to help combat baby food contamination—or it can wind down its affairs if it was never anything more than a front group for Defendants, modeled after the tactics of Big Tobacco.

278.    Discovery is needed to ascertain and confirm the facts regarding the creation, intentions, internal activities, and internal communications among Defendants. Without access to the private, non-public, confidential documents, Plaintiffs have no way of pleading these details.

### B.  The Enterprise

279.    The enterprise is the Baby Food Council, which each Defendant infiltrated and used as a vessel for fraud. Alternatively, the Baby Food Council and the Defendants formed an association-in-fact enterprise.

280.    At all relevant times, the Baby Food Council had an existence separate and distinct from each of the Defendants and was separate and distinct from the pattern of racketeering in which Defendants engaged. Likewise, each Defendant was separate and apart from the Baby Food Council and every other Defendant.

281.    Each of the Defendants made its membership in the Baby Food Council a central part of their scheme to defraud. Defendants ordinarily are competitors and should be competitors who compete for market share; instead, Defendants used the Baby Food Council as a mechanism to conspire and work together to deflect, deny, and conceal their collective food fraud against baby food purchasers.

282.    Likewise, baby food has been sold for decades in America. The Baby Food Council was created only in January 2019 because Defendants knew they were running out of time to conceal their fraud—they became desperate to create a new entity (Baby Food Council) to help deflect and deny their fraud was occurring. The timing of the Baby Food Council's creation in January 2019 further confirms it was created for the purpose of facilitating the ongoing food fraud.

283.    Through their collective membership in the Baby Food Council, each Defendant worked side-by-side (rather than in competition) with the common purpose of furthering the illegal baby food fraud scheme. Defendants further shared the common purposes of blocking food

standards from being adopted and preventing purchasers and the American public from uncovering the massive food fraud scheme they were engaged in. Defendants have formed long-term, ongoing relationships through the Baby Food Council and have demonstrated they are aligned and working together.

284.    Defendants made sure to include legitimate entities, like Cornell University, as members of the Baby Food Council and made sure the website for the Baby Food Council is hosted on Cornell's Food Science Department to lend a false aura of legitimacy. Discovery is needed to obtain the financial payments and other contributions made by Defendants to Cornell and its professors who agree to be listed on the Baby Food Council.

285.    The ordinary business of Defendants is to engage in the manufacture and sale of baby food products. It is not part of their routine business to engage in acts of mail and wire fraud to mislead purchasers about the contents of their products and their steps to combat food contamination. Nor is it part of the ordinary business to form a Baby Food Council, which was created only in January 2019, despite decades of baby food manufacturers never forming a conspiracy. It was the public release of the bombshell Consumer Reports article in 2018 that prompted the Defendants to scramble and quickly erect the Baby Food Council as a vessel for their ongoing fraud.

286.    Defendants have also made mail and wire fraud part of the ordinary business activities by routinely selling contaminated food products and engaging in advertising and marketing that is knowingly and willfully false and fraud by omission or fraud by half-truth.

287.    Each Defendant has a separate existence separate and apart from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

288.    The Baby Food Council website is a separate website that identifies the Baby Food Council as an independent entity to which each Defendant is a member. That website is hosted by Cornell's Food Science Department, further creating distinctiveness and separation from each Defendant (and also the false halo of legitimacy).

289.    Defendants have used the very independent status of the Baby Food Council as an integral part of their fraud schemes—suggesting that they are members of an independent, legitimate third-party entity that is working to combat baby food fraud contamination.

290.    The Baby Food Council might be dormant and not engaging in real activity, but Defendants have conveyed to purchasers, Congress, and the American public the opposite and are bound by those representations. By publicly touting their membership in the Baby Food Council as proof of their benevolence and commitment to baby food safety (when, in fact, the opposite is true, and they have used the Baby Food Council to co-opt reforms and conceal their fraud), Defendants have committed to the Baby Food Council being a real entity engaged in independent, legitimate activity.

### C.  The Pattern of Racketeering: Mail Fraud and Wire Fraud and Corruption of an Official Proceeding

291.    To carry out their schemes to defraud, Defendants knowingly participated, directly or indirectly, in and conducted the affairs of the Baby Food Council through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c).

292.    From at least 2019 to the present, each Defendant has worked to execute a scheme to defraud by infiltrating and using the Baby Food Council as a vessel for fraud to (1) coordinate the suppression of information revealing the widespread contamination of baby food during manufacturing; (2) delay the adoption of governmental standards for baby food manufacturers while falsely suggesting a commitment to adopt those very standards; (3) falsely suggest that

contamination of baby food products is "natural" and to omit "mercury" as a heavy metal dangerous to babies; (4) falsely suggest that they were committed to improving baby food safety, when in fact the Baby Food Council has done nothing to solve this problem since January 2019 and serves only to help Defendants prolong their fraud; (5) work to share information on heavy metals and how to deceive purchasers into believing that baby food with heavy metals is "safe" and not in violation of "standards" given that the Defendants worked to make sure no standards were adopted through the Baby Food Council co-option of this effort; and (6) conceal, camouflage, and prolong their ongoing food fraud by specifically referencing their active involvement in the Baby Food Council as proof of their commitment to baby food safety (when in fact the opposite is true) as part of statements made by interstate wire (detailed in this Complaint).

293.    Contrary to public statements made by Defendants, the Baby Food Council was designed to falsely lull purchasers of contaminated baby food (Plaintiffs and the Class) and Congress into believing that food companies are actively working to fix the food fraud that is occurring.

294.    The Baby Food Council has done nothing other than serve as a shiny distraction. Despite being formed in January 2019, the Baby Food Council has done nothing substantive to address the lack of food standards or to regulate its members. The Council has not issued any demands for product recalls, nor has it assisted its members or the public with anything. It has sat dormant merely to deflect attention and serve as a false hope that Defendants are doing something when, in fact, they are not.

295.    The five baby food companies that joined the Baby Food Council did so because they knew their scheme to defraud would soon be exposed, and they wanted to have a handy

diversion ready to convince purchasers and the government that they were actively addressing the concerns.

296.    This was a fraudulent pretext.  These companies have known for several years that their products are contaminated, and they did nothing to stop these problems, either in January 2019 or any time before.

297.    When Congress began its inquiry into allegations that baby food was contaminated with heavy metals and sought information from Defendants, they were quickly met with Defendants' proclamations that membership in the Baby Food Council meant they were dedicated to fixing the problem. *See* <u>Exhibits D, E, F, and G</u>.

> a.    On December 6, 2019, Defendant Beech-Nut represented to Congress that after the Health Babies Bright Future report, it encouraged the creation of the Baby Food Council to "conduct research and work to achieve a long-term reduction of heavy metals in the baby food supply chain" and that its current "top priority is to reduce heavy metals in the products manufactured and marketed by the member companies [including Defendant Beech-Nut] using best-in-class management practices."

In October of 2018 we encouraged Cornell University to establish a coalition of academia, baby food companies, governmental and non-governmental organizations("NGO"), including Health Babies Bright Futures, to conduct research and work to achieve a long-term reduction of heavy metals in the baby food supply chain.

Shortly thereafter, The Baby Food Council (BFC) was formed in January of 2019. Its top priority is to reduce heavy metals in the products manufactured and marketed by the member companies using best-in-class management practices. The council members meet monthly with our non-governmental organization and regulatory agencies to discuss past actions and set the agenda for future research and testing.

> b.    On December 19, 2019, Defendant Gerber represented to Congress that along with its internal programs and procedures, it was "also a founding member of the Baby

Food Council," whose objective is "reducing heavy metals in the products manufactured by the member companies to as low as reasonably achievable using best-in-class management practices." Defendant Gerber claimed that its "efforts with the Council represent our commitment to the safety of the baby food category."

In addition to the Nestlé internal programs and procedures to manage contaminants described above, Gerber is also a founding member of the Baby Food Council, which is comprised of leading companies and academic, government, and NGO partners and advisors. The Council was created in January of 2019 with the objective of reducing heavy metals in the products manufactured by the member companies to as low as reasonably achievable using best-in-class management practices.

Early efforts of the Council have focused on identifying those foods and ingredients with the highest potential to contribute to heavy metal exposure in young children. We will also be identifying and evaluating best practices that can be used to further lower heavy metal levels in these foods. Recognizing that heavy metals are widely present in the environment and can get into food, this work will initially focus on the impact of the environment and growing conditions but will also extend to other aspects of the supply chain including handling and processing. Our efforts with the Council represent our commitment to the safety of the baby food category.

    c.  On December 11, 2019, Defendant Hain responded to Congress by pointing to its membership in the Baby Food Council as an indicator of its commitment "to producing safe, nutritious, high-quality baby food products."

Hain is a member of the Baby Food Council ("Council"), a group of companies organized by Cornell University and the Environmental Defense Fund. The Council's mission is supported by the U.S. Department of Agriculture, the Food and Drug Administration ("FDA"), and other stakeholders, including Healthy Babies Bright Futures, the organization that authored the report that prompted the Subcommittee's request. Like all of the Council's member companies, Hain is committed to producing safe, nutritious, high-quality baby food products. Moreover, Hain supports the FDA finalizing guidance limiting inorganic arsenic in baby food products, and it supports the development of additional guidance limits as supported by the scientific evidence.

Heavy metals occur naturally in the environment, but their prevalence varies widely depending on food types and sources. Hain supports the Council's efforts to identify foods and ingredients with the highest potential to contribute to heavy metal exposure in children, as well as its efforts to develop effective mitigation strategies. Hain further supports the Council's decision to focus initially on environmental factors, including growing conditions and farming techniques, understanding that the Council will also assess ways to improve manufacturing and handling processes.

d. On December 18, 2019, Defendant Nurture responded to Congress by pointing to its membership in the Baby Food Council as an indication of its commitment to "reduce heavy metals in baby food products as low as reasonably achievable using best-in-class management practices."

Furthermore, we believe our approach is better than, or at least consistent with, that taken by others in our industry. Indeed, we joined the Baby Food Council, which was created this year with the objective to reduce heavy metals in baby food products as low as reasonably achievable using best-in-class management practices. This Council includes the leading baby food manufacturers as well as the Environmental Defense Fund (EDF).[7]

298. Defendants sent these fraudulent statements, via mail and e-mail, to members of the United States Congress in order to corrupt the ongoing investigation by Congress of baby food contamination.

299. Once the February 2021 congressional report was released, Defendants were again quick to tout their commitment to child safety as proven by their membership in the Baby Food Council—using its membership to lull victims into not pursuing and correcting the fraud.

300. For example, Gerber stated on its website on or around Feb. 4, 2021, that as a Baby Food Council member, it has "been working together with other industry members, the

Environmental Defense Fund, Healthy Babies Bright Futures and Cornell University" to identify "best agricultural practices" and create "a voluntary industry standard to reduce heavy metal levels in baby foods to the lowest level possible."

"As stated in our 2019 response to the Congressional Inquiry, we take many steps to minimise their presence. We prioritise growing locations based on climate and soil composition. We approve fields before crops are planted based on soil testing," the statement read.

It continued: "As a member of the Baby Food Council, we have been working together with other industry members, the Environmental Defense Fund, Healthy Babies Bright Futures and Cornell University in the identification of best agricultural practices and creating a voluntary industry standard to reduce heavy metal levels in baby foods to the lowest levels possible."

301.    While actively selling their products in January 2019 to present, the Defendants kept secret their knowledge of the massive contamination in their products. They committed fraud by omission and fraud by half-truth by advertising their products from January 2019 to present as safe, nutritious, pure, and natural—despite knowing that these representations were false and that their products were contaminated with several heavy metals.

302.    Regardless of whether the Baby Food Council was working on food standards, that lack of consensus did not grant it permission to misrepresent facts, conceal facts, omit facts, and speak in half-truths.

303.    In February 2021, when caught committing fraud, Defendants attempted to defend their scheme to defraud by claiming there are no standards, and they cannot be held accountable as a result. They advertised and made promises that were far higher and more demanding, and it is these promises and representations that they are held to under the federal fraud laws. Defendants cannot advertise and promise under one standard and then defend and deflect under a much lower one.

304.    Defendants' denial and deflection are a second stage of their ongoing scheme to defraud—the cover-up stage. Defendants knew all along that there are no baby food standards

identifying safe levels for baby food exposure, but they did not disclose this when they advertised their products. Having chosen to advertise that their foods are pure, safe, natural, and held to the highest standards, it was a fraudulent omission or fraud by half-truth to now claim that they have no obligation to minimize or eliminate exposure to these toxic heavy metals. This was not disclosed to purchasers at any time prior to February 4, 2021.

305.    According to Brian Ronholm, director of food policy at Consumer Reports, the recent uncovering of the food fraud scheme is "especially troubling" because Defendants "knew of the high levels of heavy metal contamination and still sold the products."[164]

306.    Defendants have engaged in acts of lulling as a cover-up and to continue their ongoing schemes to defraud, as evidenced by the statements alleged throughout this Complaint, and by way of further example:

307.    In a February 4, 2021 article in the Washington Post that was disseminated nationwide, Beech-Nut spoke directly to purchasers and "assured parents its baby food is 'safe and nutritious.'"[165] This statement was knowingly false and attempted to cover up the crimes that Beech-Nut committed. It effectively doubled down on its ongoing food fraud and sought to convince purchasers and parents that they could continue to purchase and have their children consume unsafe food.

---

[164] Jesse Hirch, *Heavy Metals in Baby Food: What You Need to Know*, CONSUMER REPORTS (Aug. 16, 2018) https://www.consumerreports.org/food-safety/heavy-metals-in-baby-food/; *see also*, *CR renews call for FDA and manufacturers to take action to keep infants and children safe from heavy metals in foods*, CONSUMER REPORT (Feb. 4, 2021) https://advocacy.consumerreports.org/press_release/cr-renews-call-for-fda-and-manufacturers-to-take-action-to-keep-infants-and-children-safe-from-heavy-metals-in-foods/.

[165] Dee-Ann Durbin, *Congressional Report Finds Toxic Metals in Baby Food Brands*, U.S. NEWS (Feb. 4, 2021), https://www.usnews.com/news/politics/articles/2021-02-04/congressional-report-finds-toxic-metals-in-baby-food-brands.

308.    In a February 4, 2021 article in the Wall Street Journal that was widely disseminated, Gerber spoke directly to purchasers and stated that "all of its food meets its safety standards, which it says are among the strictest in the world."[166]

309.    In a February 4, 2021 press release that was widely disseminated and posted by Good Morning America[167] and other news outlets, Hain spoke directly to purchasers, stating: "Nothing is more important to Earth's Best than the trust and confidence of parents that our organic products provide safe nutrition for healthy babies. Our rigorous internal standards and testing procedures ensure Earth's Best products meet or exceed the current federal guidelines."[168]

310.    In a February 5, 2021 article in People that was widely disseminated, Nurture spoke directly to purchasers, "We can say with the utmost confidence that all Happy Family Organics products are safe for babies and toddlers to enjoy, and we are proud to have best-in-class testing protocols in our industry."[169]

311.    The predicate acts of racketeering (18 U.S.C. § 1961(1)) engaged in by Defendants include, but are not limited to:

---

[166] Annie Gasparro & Sharon Terlep, *Toxic Heavy Metals Found in Some Baby Food, Congressional Report Says*, WALL STREET JOURNAL (Feb. 4, 2021), https://www.wsj.com/articles/toxic-heavy-metals-found-in-some-baby-food-congressional-report-says-11612451332.

[167] Katie Kindelan and Kelly McCarthy, *Some popular baby foods contain 'significant levels' of toxic heavy metals, report says,* GOOD MORNING AMERICA (Feb. 5, 2021), https://www.goodmorningamerica.com/wellness/story/popular-baby-foods-significant-levels-toxic-heavy-metals-75685913.

[168] *February 4, 2021 Press Release*, HAIL CELESTIAL (Feb. 4, 2021) https://ir.hain.com/news-releases/news-release-details/statement-behalf-earths-best-organic-response-congressional.

[169] Benjamin VanHoose, *Investigation Finds Baby Food Products 'Tainted with Significant Levels of Toxic Heavy Metals', People,* PEOPLE.COM (Feb. 5, 2021), https://people.com/parents/baby-food-found-tainted-dangerous-levels-toxic-heavy-metals-congressional-investigation-report/.

a. <u>Mail Fraud</u>:  Defendants' entities violated 18 U.S.C. § 1341 by engaging in an unlawful scheme to defraud involving false pretenses, misrepresentations, promises, half-truths, and omissions. In furtherance of this scheme, Defendants used the mails:

    i. Defendants shipped, or caused to ship, via interstate mail the baby food products that were purchased by Plaintiffs and the Class.

    ii. Defendants used the mails to send letters to the U.S. House of Representatives in December 2019 to perpetuate their false pretenses, misrepresentations, promises, half-truths, and omissions.

    iii. Defendants used the mails in furtherance of their scheme to defraud and, in fact, could not have accomplished their scheme to defraud without using the mails to ship their products to all fifty states.

    iv. Further discovery will likely uncover additional uses of the mail.

b. <u>Wire Fraud</u>:  Defendants violated 18 U.S.C. § 1343 by engaging in an unlawful scheme to defraud involving false pretenses, misrepresentations, promises, half-truths, and omissions. In furtherance of this scheme, Defendants used the interstate wires, including the Internet, email, and use of the telephone across state lines.

    i. Defendants have engaged in extensive, nationwide (interstate) advertising campaigns using Facebook, email, and the Internet to reach consumers in all 50 states with false pretenses, misrepresentations, promises, half-truths, and omissions. *See also* Factual Background, Section IV.D.3.

| Defendant | Date | Representation in Furtherance of the Scheme to Defraud |
|---|---|---|
| **Beech-Nut** | Since at least 5/30/2017 | Beech-Nut baby food is "clean food" and "classic, natural and organic real food for babies and toddlers" "with just real, simple ingredients" |
| | ~8/16/2018 | "We want to reassure parents that Beech-Nut's real food for babes is healthy, nutritious and safe."<br><br>"We want to assure parents that . . . we have high confidence in the quality and standards we use in making our food."<br><br>"Currently, no government standard or recommendation exists for lead." |
| | 3/21/2018 | Beech-Nut products contain "nothing else" but the listed ingredient |
| | 3/28/2019 | Beech-Nut products are for consumers who are "label readers" and look for "natural ingredients only." |
| | Since at least 7/13/2019 | "what's inside your baby food matters"<br><br>Beech-Nut "offer[s] natural and organic products"<br><br>"In fact, we conduct over 20 rigorous tests on our purees, testing for up to 255 pesticides and heavy metals (like lead, cadmium and other nasty stuff). Just like you would, we send the produce back if it's not good enough." |
| | 10/17/2019 | "Our process starts with high-quality fruits and vegetables that meet BNN's own standards, which in some cases are 10 times stricter than those of the U.S. government. For example, we test for 255 common contaminants, such as lead, other heavy metals and pesticides, to confirm that all the ingredients delivered to us and used in our products comply with our standards.  If they don't, we send them back." |
| | 12/6/2019 | Beech-Nut applied "rigorous testing protocols and heavy metal testing standards which are continuously reviewed and strengthened."<br><br>Beech-Nut encouraged the creation of the Baby Food Council to "conduct research and work to achieve a long-term reduction of heavy metals in the baby food supply chain" and that its current "top priority is to reduce heavy metals in the products manufactured and marketed by the member |

| Defendant | Date | Representation in Furtherance of the Scheme to Defraud |
|---|---|---|
| | | companies [including Defendant Beech-Nut] using best-in-class management practices." |
| | Since at least 6/14/2020 | Beech-Nut "only" uses "real," "quality" ingredients |
| | 2/4/2021 | Beech-Nut "assured parents its baby food is 'safe and nutritious.'" |
| | ~2/5/2021 | Beech-Nut products are "safe and nutritious" |
| **Campbell** | 12/11/2017 | "We believe that Plum's products are safe to eat. Our testing confirmed that the averaged results for heavy metals in all tested Plum products gave concentrations that are typical for those ingredients – whether that's a leafy green grown in your own garden or a bunch of carrots purchased at the farmer's market. The results also demonstrate our tested products are below exposure limits set by certain domestic and international regulatory bodies." |
| | 2/12/2018 | The mission that Plum Organics promises is that it will provide "little ones" with "the very best food from the first bite." |
| | 6/7/2019 | The back of the Plum Organics' pouch lets customers "find out exactly what [you are] getting!" |
| | 12/11/2019 | "Campbell has conducted testing on every Plum Organics product on the market to ensure none exceed acceptable levels of arsenic, lead, cadmium, or mercury… To date, no Plum Organics foods have been found to be above exposure limits set by available domestic and international regulatory bodies . . . ." |
| | Since at least 8/12/2020 | Plum Organics baby foods are "absolutely" "safe to eat" and that "health and safety are always" its "top priorities."<br><br>"We believe ingredient testing allows for better control of the entire product and gets us ahead of any potential issues before it makes its way into a product. It's just like when you make a recipe at home – you want to know everything that's going into the recipe." |

| Defendant | Date | Representation in Furtherance of the Scheme to Defraud |
|---|---|---|
| | 2/5/2021 | "Campbell has conducted testing on every Plum Organics product on the market to ensure none exceed acceptable levels of arsenic, lead, cadmium, or mercury." |
| **Gerber** | ~8/16/2018 | "All of our foods meet our safety and quality standards, which are among the strictest in the world."<br><br>"Our rigorous standards are developed by evaluating the latest food safety guidance – from sources like the Food and Drug Administration, Environmental Protection Agency, and international health authorities. Gerber also partners with our farmers and our ingredient and packaging suppliers to control, reduce and limit contaminants in all our foods." |
| | 12/19/2019 | Gerber "takes all concerns related to safety very seriously, which is why all of our foods and beverages meet our safety and quality standards and conform to all regulatory compliance guidelines."<br><br>Gerber was "also a founding member of the Baby Food Council," whose objective is "reducing heavy metals in the products manufactured by the member companies to as low as reasonably achievable using best-in-class management practices." Defendant Gerber claimed that its "efforts with the Council represent our commitment to the safety of the baby food category." |
| | Since at least 9/30/2020 | Gerber rice cereals will help support "learning ability"<br><br>Gerber Clean Field Farming Standards ensure that its baby foods are "safe and wholesome." |
| | 10/12/2020 | Gerber Clean Field Farming Standards allow it to "ensure that [our produce is] safe and wholesome for baby." |
| | Since at least 11/25/2020 | Gerber knows that parents want "the very best for your little one to ensure she reaches her full potential, and so do we."<br><br>Gerber represents to parents that it has adopted "super strict" farming practices "to ensure that their fruit and vegetable purees are not only nutritious, but also wholesome and safe for even the littlest bodies." |

| Defendant | Date | Representation in Furtherance of the Scheme to Defraud |
|---|---|---|
| | | Gerber believes "that little ones deserve the highest standards set just for them" guides its mission to "deliver the very best fruits and veggies."<br><br>Gerber represents that its growing standards are the "strictest in the world" to ensure "quality control" because "what you get out is what you put in."<br><br>Gerber's Clean Field Farming process "ensure[s] our purees are not only nutritious, but also wholesome and safe for every tiny tummy." |
| | ~2/4/2021 | Gerber has "been working together with other industry members, the Environmental Defense Fund, Healthy Babies Bright Futures and Cornell University" to identify "best agricultural practices" and create "a voluntary industry standard to reduce heavy metal levels in baby foods to the lowest level possible."<br><br>Gerber stated that "all of its food meets its safety standards, which it says are among the strictest in the world." |
| | 2/5/2021 | Gerber's standards "are among the strictest in not just the US, but the world… where government standards don't currently exist, we develop our own rigorous standards." |
| | ~2/5/2021 | "We want to reassure parents Beech-Nut products are safe and nutritious…. We look forward to continuing to work with the FDA, in partnership with the Baby Food Council…" |
| **Hain** | Since at least 5/16/2016 | Products are "time-trusted and safe" and "made from pure ingredients to help children grow up strong and healthy"<br><br>Hain knew that parents cared about whether "potentially harmful" contaminants were in their products because it noted that its food is "produced without the use of potentially harmful pesticides" but Hain omits that the products ***do*** contain other "potentially harmful" contaminants, namely toxic heavy metals |
| | Since at least 6/1/2019 | Hain "recognized the importance of wholesome, pure nourishment for babies" so its products are "created with care, using pure, simple ingredients found in nature." Because of this "principle," Hain tells parents that they "can trust Earth's |

Page 115 - Class Action Complaint

| Defendant | Date | Representation in Furtherance of the Scheme to Defraud |
|---|---|---|
| | | Best® products to be safe for your baby and safe for the environment." |
| | Since at least 7/18/2019 | Hain has a "rigorous quality assurance process" which allows them to provide "better-for-baby products that are pure, safe and sustainable." |
| | | "rigorous product testing" as a "guarantee" to parents of the "quality and safety" of Earth's Best products |
| | | Hain's "Promise" to produce "pure, quality products you can trust." |
| | 12/11/2019 | Hain's membership in the Baby Food Council is an indicator of its commitment "to producing safe, nutritious, high-quality baby food products." |
| | 2/4/2021 | "Our rigorous internal standards and testing procedures ensure Earth's Best products meet or exceed the current federal guidelines." |
| | | "Nothing is more important to Earth's Best than the trust and confidence of parents that our organic products provide safe nutrition for healthy babies." |
| **Nurture** | 7/2/2019 | Nurture holds its "ingredients to the highest standards, because your baby deserves the best." |
| | 7/17/2019 | Nurture's Happy Baby Superfood Puffs "support brain health" |
| | 8/16/2019 | Nurture "partner[s] with pediatricians, dietitians, and children's health experts [it] trust[s]—so your family can trust our organic food." |
| | 11/25/2019 | Nurture represented that consumers "can skip all these chemicals when you buy organic food" |
| | 12/18/2019 | Nurture's membership in the Baby Food Council is an indication of its commitment to "reduce heavy metals in baby food products as low as reasonably achievable using best-in-class management practices." |
| | Since at least 8/13/2020 | Customers can have "peace of mind" because Nurture "source[s] high-quality organic ingredients" and has "rigorous |

| Defendant | Date | Representation in Furtherance of the Scheme to Defraud |
|-----------|------|--------------------------------------------------------|
|  |  | and uncompromising quality standards" so consumers "can feel confident" in what they are feeding their family.<br><br>Nurture emphasizes that it goes beyond USDA organic standards because it knows that what children eat in the first few years of life is "crucial." Nurture assures parents that it holds itself to "strict standards" to help children "grow healthy and strong" through "test[ing] and thoroughly analyz[ing] every batch of food."<br><br>Parents can "trust" its organic food because Nurture "partner[s] with pediatricians, dietitians, and children's health experts." |
|  | 2/5/2021 | "We can say with the utmost confidence that all Happy Family Organics products are safe for babies and toddlers to enjoy, and we are proud to have best-in-class testing protocols in our industry." |
|  | Since at least 2/5/2021 | "We can say with the utmost confidence that all Happy Family Organics products are safe for babies and toddlers to enjoy and we are proud to have best-in-class testing protocols in our industry. We only sell products that have been rigorously tested and we do not have products in-market with contaminant ranges outside of the limits set by the FDA." |

    ii.  Defendants used the interstate wires to communicate with one another via email or telephone regarding the Baby Food Council.

    iii.  The Baby Food Council website was created on or around January 2019. This website uses the interstate wires to suggest a legitimate entity that is engaged in meaningful activity.

    iv.  Defendants used email and interstate wires to send letters to the U.S. House of Representatives in December 2019 to perpetuate their false pretenses, misrepresentations, promises, half-truths, and omissions.

v.   Defendants used email and interstate wires to issue press releases, set forth above, on or around February 4, 2021, to deny the food fraud that Congress uncovered and to lull their victims into believing this fraud had stopped. Without use of the interstate wires, Defendants could not have communicated with Plaintiffs or the class either when marketing and advertising their products or when denying and covering up their scheme to defraud.

vi.  Defendants have coordinated their cover-up schemes with each other and the Baby Food Council over email and telephone calls throughout February 2021.

vii. Because the emails and telephone calls of Defendants are in their exclusive possession and are not publicly available, discovery is needed for Plaintiffs to plead the exact dates and names of the persons who made these communications.

312.    This pattern of racketeering is open-ended and remains ongoing to this day. Only by pursuing this lawsuit and financially punishing Defendants will the pattern of racketeering at issue here finally cease. Defendants continue to deny their ongoing food fraud and have not recalled the dangerous baby food products that they have sold and continue to sell in interstate commerce in all 50 states.

313.    The predicate acts are all related because they were all done in furtherance of the same overall goal and common purpose of the RICO enterprise: to allow Defendants to sell baby food without engaging in safe (and more costly) food production, manufacturing, and processing. The predicate acts allowed Defendants to cut corners and save millions of dollars, which translated

into bigger bonuses for their executives, higher stock prices, and more dividends and distributions for their companies.

314.    The predicate acts have not ceased and will continue until this Court awards relief. By pursuing this RICO claim, Plaintiffs further hope to prompt criminal investigations and prosecutions by state and federal prosecutors.

### D. Causation and Damages

315.    There is a direct and straight line from the scheme to defraud to the damages suffered. The Defendants marketed and advertised directly to the purchasers and parents in the Class. No other group was the focus of this advertising, and no other group can sue for this RICO claim. Likewise, once their schemes to defraud were exposed by Congress, Defendants continued to speak through press releases and newspapers to consumers.

316.    There are no intervening steps or causes that could have prevented or altered, or even interfered with, the fraud the Defendants committed using the Baby Food Council as an enterprise.

317.    All Plaintiffs and members in the class purchased contaminated baby food in reasonable reliance upon the market conduct, representations, statements, promises, and suggestions made in the advertisements and marketing campaigns of Defendants.

318.    Defendants not only made specific material misstatements of fact, but they also engaged by fraud by omission, fraud by half-truth, and fraudulent concealment. Every member of the class was a victim of the schemes to defraud through one of these forms of fraud.

319.    But for the fraudulent marketing and advertising, and but for the fraudulent cover-up campaign (using the Baby Food Council as proof of Defendants' legitimacy), the purchasers and parents in the Class would not have bought the contaminated products and would not continue to buy them today.

320.    By reason of, and as a result of, the conduct of Defendants, Plaintiff and Class members have been injured in their property (money is property) by purchasing "essentially worthless" products that failed to meet their essential and marketed/advertised purpose: being healthy, pure, natural, and safe. Given that the product is baby food, and children and babies are particularly vulnerable, Defendants knew that the safety, contents, and purity of the food being sold was especially important. Indeed, they tailored their marketing and sales communications directly to this issue, preying on the purchasers' vulnerability and desperation as parents to do everything possible to feed their children healthy and safe food. Defendants exploited that vulnerability, knowing that Plaintiffs and the class had (and have) no way of uncovering the fraud at issue.

321.    It was foreseeable—and, indeed, fully known—to Defendants that Plaintiffs and the Class members would not have purchased the contaminated food products had Defendants fully disclosed all known facts about the baby food products. Defendants purposefully omitted material facts from their advertisements and made sure that Plaintiffs and the Class never were fully aware of all facts and circumstances.

322.    Defendants' violations of 18 U.S.C. § 1962(c) and (d) have directly and proximately caused injuries and damages to Plaintiff and Class members. Plaintiff and Class members are entitled to bring this action for three times their actual damages, as well as costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(a) and (c).

323.    If a Defendant is not guilty as a primary RICO violator under § 1962(c), it is liable for conspiring to violate RICO by engaging in the same schemes to defraud set forth above.

324.    Each Defendant violated § 1962(d) by agreeing to participate, directly or indirectly, in the schemes to defraud outlined above.

## DEMAND FOR JURY TRIAL

325.    Plaintiffs are entitled to and hereby demand a jury trial in this matter.

## PRAYER FOR RELIEF

326.    Wherefore, Plaintiffs respectfully request that this Court will:

  a.  Enter judgment against Defendants, jointly and severally, in such amounts as will fully and adequately compensate Plaintiffs for the damages they have suffered, in an amount to be determined at trial;

  b.  Award Plaintiffs damages and treble damages under the RICO Act;

  c.  Award Plaintiffs injunctive relief that requires Defendants to test and inspect final baby food prior to sale and establish supervision and compliance protocols that prevent the sale of baby food products contaminated with unsafe levels of toxic heavy metals;

  d.  Award Plaintiffs pre-judgment and post-judgment interest;

  e.  Award Plaintiffs their actual expenses of litigation, including reasonable attorney's fees;

  f.  Appoint Plaintiffs as class representatives;

  g.  Appoint Plaintiffs' counsel as counsel for the class;

  h.  Award Plaintiffs such other and further relief as the Court deems just and proper.

Respectfully submitted,

*s/ John C. Rake*

John C. Rake, OSB #105808
jrake@lvklaw.com
Larkins Vacura Kayser LLP
121 SW Morrison Street, Suite 700
Portland, Oregon  97204
Telephone:  503-222-4424


Ruth Anne French-Hodson, KS #28492 (*pro hac vice forthcoming*)
SHARP LAW, LLP
4820 W. 75th Street
Prairie Village, KS  66208
(913) 901-0505
(913) 901-0419 fax
rafrenchhodson@midwest-law.com

Attorneys for Plaintiffs Kathryn Gavula and
Barbara Wicker

## APPENDIX OF EXHIBITS

**Exhibit A:** Staff Report, Subcommittee on Economic and Consumer Policy of the Committee on Oversight and Reform, U.S. House of Representatives, *Baby Foods Are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury* (February 4, 2021)

**Exhibit B:** Healthy Babies Bright Futures, *What's In My Baby's Food?,* Oct. 2019.

**Exhibit C:** Clean Label Project, *Baby Food: A Puree of Plasticizers and Heavy Metals*, Aug. 10. 2020.

**Exhibit D:** Letter from the President and CEO of Beech-Nut Nutrition Company to Chairman Raja Krishnamoorthi, Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform (Dec. 6, 2019)

**Exhibit E:** Letter from Nurture, Inc. to Chairman Raja Krishnamoorthi, Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform (Dec. 18, 2019)

**Exhibit F:** Letter from Kelly B. Kramer, Counsel for The Hain Celestial Group, Inc. to Chairman Raja Krishnamoorthi, Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform (Dec. 11, 2019)

**Exhibit G:** Letter from the Chief Executive Officer of Gerber Products Company to Chairman Raja Krishnamoorthi, Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform (Dec. 19, 2019)

**Exhibit H:** Letter from Thomas J. Perrelli, Counsel for Campbell to Chairman Raja Krishnamoorthi, Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform (Dec. 11, 2019)

**Exhibit I:** Hain slideshow to FDA.